SULTAN CHEMISTS, INC., Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Respondent.

No. 00–3711.

United States Court of Appeals,
Third Circuit.

Argued July 12, 2001.

Filed Feb. 6, 2002.

Bruce Robins (Argued), Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, New York City, for petitioner.

Michele L. Walter (Argued), United States Department of Justice, Environmental Defense Section, Washington, D.C., for respondent.

Before: SLOVITER, ALITO, and
GREENBERG, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

■ The petitioner, Sultan Chemists, Inc. ("Sultan"), has filed a petition for review of the final decision of the Environmental Appeals Board ("EAB") of the Environmental Protection Agency ("EPA"). The EAB affirmed an administrative enforcement action against Sultan for eighty-nine violations of § 12 of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136j (2001),[1] which makes unlawful, among other things, the sale or distribution of a pesticide that has not been registered or otherwise authorized in the manner required by law. Sultan was found liable for distributing or selling unregistered pesticide products and was assessed a civil penalty of $175,000. Sultan does not challenge the violation.[2] Instead it relies on the guaranty provision of FIFRA § 12(b)(1), which allows a person to avoid liability if s/he received the pesticide from a person who guaranteed, in writing and in a specified form, that the pesticide was legally registered and otherwise satisfied the requirements of FIFRA. Sultan claims that it has established that it received such a guaranty and therefore it should not be liable under § 12. It appears that this case raises a matter of first impression in the federal appellate courts about what constitutes a guaranty under FIFRA § 12(b)(1) that will shield distributors from liability.

## I.

### BACKGROUND

FIFRA regulates the manufacture, sale, distribution, and use of pesticides through a national registration system. Under FIFRA, pesticides must be registered with the EPA before they can be sold or distributed. 7 U.S.C. §§ 136a(a), 136j(a)(1)(A).

Sultan manufactures and distributes dental supplies and has held various pesticide registrations with the EPA since 1973. On October 14, 1992, Sultan entered into an agreement ("the Agreement") with Health Care Products Inc. ("HCP"), a Canadian manufacturer, and Meditox Inc. ("Meditox"), HCP's principal distributor in the United States. App. at 405–35. The Agreement provided that Sultan would distribute a line of antimicrobial pesticide products manufactured by HCP ("Products"), including glutaraldehyde solution ("the Solution"), disinfectant towelettes, infection control kits, infection control kit refills, disinfectant spray, and disinfectant solution concentrate. App. at 428. The Agreement contained an explicit guaranty as to the Solution's registration. The Agreement also stated that the Solution formed the basis for all of the Products. App. at 423 ("Meditox and HCP warrant that the U.S. EPA has assigned No. 58994–1 to the Solution, the formulation of which forms the basis for all of the Products."). See also App. at 411, 431.

During two EPA inspections in 1993, the Office of Enforcement and Compliance As-

---

1. We refer to § 12 of FIFRA by its section number throughout the text in the interest of brevity, but all other FIFRA sections will be referenced by their U.S. Code section numbers.

2. On appeal, Sultan states that four of the counts involve products that were not shipped

out. However, these products were found, as part of the EPA's inspections, in finished packages, released for shipment, and stored with other such pesticides that were finished and released for shipment. This fits within the statutory preclusion of prohibited actions. 7 U.S.C. § 136(gg).

surance found that four of the products distributed or sold by Sultan were not registered. These four products were: (1) WipeOut Disinfectant Towelettes ("Towelettes"); (2) WipeOut Disinfectant Spray ("Spray"); (3) WipeOut Disinfectant Wand ("Wand"); and (4) QuicKit Biological Fluid Emergency Spill Kit ("QuicKit"). Each of these contained the Solution, which had been properly registered with the EPA. However, FIFRA requires a separate registration for each pesticide product, defined in the applicable regulation as:

[A] pesticide in the particular form (including composition, packaging, and labeling) in which the pesticide is, or is intended to be, distributed or sold. The term includes any physical apparatus used to deliver or apply the pesticide if distributed or sold with the pesticide.

40 C.F.R. § 152.3(t) (2001). The Wand, Towelettes, Spray, and QuicKit were not separately registered.

On February 15, 1995, the EPA issued a complaint against Sultan for eighty-nine counts of distributing or selling the four unregistered products, in violation of FIFRA § 12(a)(1)(A), 7 U.S.C. §§ 136a(a), 136j(a)(1)(A), and seeking $445,000 in penalties. Each count pertained to the distribution or sale of a specific unregistered pesticide to particular customers on separate occasions. Sultan requested a formal administrative hearing, which was held on September 23, 1998 with an Administrative Law Judge as the Presiding Officer ("PO"). Sultan defended primarily with two arguments.

First, Sultan argued that the Agreement created a valid guaranty from HCP and Meditox under FIFRA § 12(b)(1) with respect to all the Products, thereby shielding Sultan from liability for distributing the four unregistered products. Section 12(b)(1) allows an exemption from liability

for violating the registration requirement for:

[A]ny person who establishes a guaranty signed by, and containing the name and address of, the registrant or person residing in the United States from whom the person purchased or received in good faith the pesticide in the same unbroken package, to the effect that the pesticide was lawfully registered at the time of sale and delivery to the person, and that it complies with the other requirements of this subchapter, and in such case the guarantor shall be subject to the penalties which would otherwise attach to the person holding the guaranty under the provisions of this subchapter.

7 U.S.C. § 136j(b)(1). Second, Sultan argued that the proposed penalty was inappropriate and was not properly assessed under the statutory criteria set out in FIFRA. *See* 7 U.S.C. § 136l.

The PO focused on whether the Agreement created a valid guaranty under FIFRA § 12(b)(1). Even granting that Sultan believed in good faith that the Agreement contained an unambiguous guaranty that all of the Products were registered, the PO found that the guaranty language of the Agreement only applied to the Solution. With respect to the other Products, the Agreement failed to fulfill all of the requirements set out in FIFRA's guaranty clause. Sultan had argued that the statement in the Agreement to the effect that the Solution formed the basis for all of the Products was sufficient to establish a written guaranty that all of the Products were registered. The PO rejected that argument, finding that the Agreement clearly distinguished between the Solution and the Products since the Agreement defined "Products" to include the Solution as well as the Towelettes, QuicKit, and Spray. Further, the PO in-

terpreted FIFRA as establishing specific criteria for creating a guaranty, and he found that at least one of these elements was not satisfied, namely HCP and Meditox did not assert in the Agreement that the Products were lawfully registered at the time of the sale and delivery to Sultan.

At the hearing Sultan sought to introduce extrinsic evidence to support its view of the meaning of the Agreement. The EPA objected to this evidence, which included the testimony of Sultan's attorney, Gabriel Kaszovitz, and its president, Paul Seid, both of whom took part in negotiating the Agreement. In testimony, both Seid and Kaszovitz said that they were assured during the negotiations with Meditox and HCP that the Products met EPA regulations and, further, that the signers of the Agreement intended it to warrant that the Products were approved by the EPA. App. at 268–71, 336, 344–45. This extrinsic evidence also included draft labels for some of the Products, which contained EPA registration numbers, and advertising material, which Meditox sent to Sultan, stating that the WipeOut products passed EPA efficiency tests. Sultan argued that this evidence established a "course of dealing" that showed the parties intended to create a guaranty covering all of the Products (including those that were in fact unregistered pesticides).

The PO held he would consider extrinsic evidence under § 672.202(1) of the Uniform Commercial Code contained in the Florida Code,[3] which provides that terms of a contract "may be explained or supplemented" by evidence of the "course of dealing" or "course of performance." Fla. Stat. § 672.202 (2001). The PO decided, however, that the evidence offered was insufficient to establish a clear course of dealing. He also excluded evidence pertaining to the course of performance because Sultan did not specifically raise the issue in its post-hearing brief.

On August 4, 1999, the PO issued an Initial Decision finding Sultan liable for all eighty-nine counts. The EPA had proposed a penalty of $445,000 (eighty-nine counts multiplied by $5,000 per count). In considering the appropriate penalty, the PO applied the following penalty factors set forth in FIFRA: (1) the gravity of the violation; (2) the size of the business; and (3) the ability to pay. 7 U.S.C. § 1361(a)(4). In accordance with the rules governing EPA assessment of civil penalties, 40 C.F.R. § 22.27(b) (2001), the PO also turned to the "FIFRA Enforcement Policy" set forth by the EPA Office of Compliance Monitoring and Office of Pesticides & Toxic Substances in the *Enforcement Response Policy for the Federal Insecticide, Fungicide, and Rodenticide Act* (July 2, 1990), App. at 556–609, to help interpret these factors. In consideration of the penalty factors, the PO first reduced the base penalty to $197,421. Then because of additional factors (i.e., Sultan was not the actual manufacturer; Sultan did not intentionally violate the law; Sultan held a good faith belief that there was a valid guaranty for the unregistered pesticides), the PO made an additional, discretionary eleven-percent reduction of the penalty to $175,000.

On September 24, 1999, Sultan appealed to the EAB, raising three issues: (1) whether the PO erred in holding that the Agreement failed to create a valid guaranty under FIFRA § 12(b)(1); (2) whether he improperly excluded extrinsic evidence relating to the parties' "course of perfor-

---

**3.** The Agreement provided that it shall "be construed and enforced in accordance with the laws of the State of Florida." App. at 426. The EPA and Sultan agree that Florida contract law guides the construction of the Agreement.

mance"; and (3) whether he improperly assessed the $175,000 penalty. On September 13, 2000, the EAB affirmed the PO's findings and penalty.

The EAB reiterated the PO's interpretation of FIFRA § 12(b)(1) as establishing six specific requirements. For Sultan to have a valid guaranty, FIFRA requires that:

(1) the guaranty was written;

(2) the guaranty included the signatures, names, and addresses of HCP and Meditox;

(3) the guaranty provided that the unregistered products were lawfully registered at the time of sale and delivery to Sultan;

(4) the guaranty provided that the unregistered products comply with the other requirements of FIFRA subchapter II;

(5) Sultan received the unregistered products in good faith; and

(6) Sultan purchased or received the unregistered products in an unbroken package.

*See* App. at 43–44. The EAB agreed with the PO that the Agreement lacked the third requirement. The EAB found that the Agreement also failed to satisfy the fourth requirement since it did not assert that the unregistered pesticides complied with FIFRA's other requirements.

With regard to extrinsic evidence, the EAB found that the PO erred in excluding evidence as to course of performance because, in its brief, Sultan used the terms "course of dealing" and "course of performance" interchangeably. Nonetheless, it held that the extrinsic evidence offered was insufficient to establish either a course of dealing or a course of performance. The EAB also affirmed the penalty that the PO assessed, rejecting Sultan's arguments that the penalty was still excessive

in light of Sultan's good faith, lack of willfulness, and limited finances.

Sultan petitioned this court for review and listed the following as the issues presented: (1) whether the EAB abused its discretion by construing the Agreement as failing to satisfy the requirements of FIFRA § 12(b)(1); (2) whether the EAB abused its discretion in deciding that Sultan's extrinsic evidence was insufficient to show that the Agreement created a guaranty under § 12(b)(1); and (3) whether the EAB abused its discretion in interpreting FIFRA's penalty factors and in assessing the $175,000 penalty.

## II.

### JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction to review the decision of the EAB pursuant to 7 U.S.C. § 136n(b). Under FIFRA, the factual findings of the EAB "shall be sustained if [they are] supported by substantial evidence when considered on the record as a whole." 7 U.S.C. § 136n(b). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564–65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quotations and citation omitted). With regard to the interpretation of FIFRA, "if [a] statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). With respect to legal questions generally, under the Administrative Procedure Act this court's scope of review is limited to determining whether an agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A) (2001).

## III.

## DISCUSSION

A. *Requirements of FIFRA § 12(b)(1)*

■ We first evaluate the EAB's interpretation of FIFRA § 12(b)(1) as establishing six requirements necessary for creating a guaranty. The EPA argues that one must first look to the plain language of the statute in order to interpret it. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (interpreting the Freedom of Information Act). When read in its ordinary, everyday sense, the provision does set out clear requirements. The EAB's construction of these requirements as providing for six specific elements comports with the plain language of the provision.

■ Sultan argues that the EPA's interpretation of FIFRA is "hypertechnical" and that the statute does not impose "rigid" or "overly exacting" standards. Sultan notes that the statute requires only that there be a guaranty "to the effect" that the pesticide was lawfully registered, 7 U.S.C. § 136j(b)(1), which it argues suggests that the guaranty requirement is not especially stringent. In contrast, the EAB interprets the same language to require that there must be some assertion in the written instrument "to the effect" that the pesticides were "lawfully registered." That is not an unreasonable interpretation. Even if a statute's language is ambiguous, courts should defer to an agency's reasonable interpretation of a statute if Congress has explicitly or implicitly delegated to the agency the authority to issue an interpretation having the force of law and the interpretation at issue is promulgated in

the exercise of that authority. *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001). Such delegation may be inferred when the agency issues the interpretation in "formal adjudication," *id.* at 2173, which is what occurred here.

■ Sultan also takes issue with the EAB's interpretation of the guaranty in the Agreement as applying only to the Solution. The EPA asserts that the language of the Agreement provides "the best evidence of the intent and meaning of the parties." *Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp.*, 364 So.2d 15, 17 (Fla.Dist.Ct.App.1978) (citation omitted). It also argues that the EAB gave the terms of the Agreement "the meaning that would be attached to them by an ordinary person of average understanding." *Stewart Petroleum Co., Inc. v. Certain Underwriters at Lloyd's London*, 696 So.2d 376, 379 (Fla.Dist.Ct. App.1997) (quotations and citation omitted).

Sultan argues that the Agreement contained representations that all of the Products were registered at the time of the sale and delivery to Sultan, thus satisfying FIFRA § 12(b)(1). Specifically, Sultan points to the statement that "Meditox and HCP warrant that the U.S. EPA has assigned No. 58994–1 to the Solution, the formulation of which forms the basis for all of the Products." App. at 423.

The PO and the EAB pointed to other statements in the Agreement that clearly undermine Sultan's argument. Throughout the Agreement there is a distinction made between the "Solution" and the general category of the "Products," which includes the Solution along with three of the unregistered pesticides that Sultan distrib-

uted.[4] This distinction is shown most clearly in Schedule "A" of the Agreement which defines the Solution as one of the Products, establishing "Solution" and "Products" as separate terms. App. at 428. This distinction is also shown in § 10 of the Agreement in which Meditox and HCP warrant that the *Solution* has an EPA number assigned to it while HCP confirms that the *Products* have "received all necessary regulatory authority approvals *in Canada.*" App. at 423–24 (emphasis added). Such language in the Agreement shows that the assertions about the Solution apply only to the Solution and not to the remaining Products. *See Campbell v. Campbell*, 489 So.2d 774, 777 (Fla.Dist.Ct.App.1986) (stating that "the use of different language strongly implies that a different meaning was intended"). As the PO noted, "[t]he fact that the Solution 'forms the basis for all the Products' does not make the Solution the equivalent of the Products." App. at 14.

In addition, the Wand is not specifically mentioned in the Agreement. App. at 424. There is, thus, no argument that the Agreement intended the Wand to be registered. Further, there is no assertion in the Agreement that any of the unregistered products complied with the other FIFRA requirements.[5] The fact that the parties failed to include guaranty language for the unregistered products similar to that used for the Solution clearly shows that they did not intend the other products to be covered. *See Azalea Park Utils., Inc. v. Knox–Florida Dev. Corp.*, 127 So.2d 121, 123 (Fla.Dist.Ct.App.1961) (noting that courts are reluctant to add terms to a contract by implication).

Finally, Sultan's assertion that the guaranty for the Solution creates a guaranty for the other Products conflicts with FIFRA. Under FIFRA's implementing regulations, one registration cannot apply to other pesticide products that have different compositions, packaging or labeling, or include different delivery or application apparatus. Notwithstanding the presence of the same active ingredient in the pesticides, each is an individual "pesticide product" if it has a different composition, packaging, labeling, delivery or application method. 40 C.F.R. § 152.3(t). It follows that the Towelettes, QuicKit, Spray, Wand, and Solution are each a separate pesticide product, requiring separate registrations. Although the Solution was assigned a registration number, this number could not be assigned to more than one pesticide product.

■ Sultan asserts that it clearly intended for all of the Products to be covered by the guaranty in the Agreement since it would be against common sense for Sultan to have obtained a guaranty for only one of the products it intended to distribute. Whatever Sultan's subjective intention, the language of the Agreement contains no assertion to show that HCP and Meditox guaranteed the registration of all of the Products. A court cannot cure Sultan's failure to obtain broader assurances from HCP and Meditox, as it must not "rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain." *Barakat v. Broward County Hous. Auth.*, 771 So.2d 1193, 1195 (Fla. Dist.Ct.App.2000) (citation omitted).

---

4. Although Sultan distributed four unregistered products, as noted in the text *infra* only three are mentioned in the Agreement. The Wand is not.

5. For example, an applicant for registration under FIFRA must state the pesticide's complete formula, the claims made by the pesticides, directions for its use, and a complete copy of the label. 7 U.S.C. § 136a(c).

Finally, Sultan argues that the EPA's "hypertechnical" interpretation of both the Agreement and FIFRA's guaranty provision runs counter to the purpose of the guaranty provision, which is to shift liability to manufacturers who lie about whether or not their products are registered. Br. of Petitioner at 4. Sultan argues that if the guaranty provision does not apply when a distributor made a good faith mistake about a guaranty, then it is unclear under what circumstances, if any, it would apply. As discussed above, however, the EAB's construction of FIFRA § 12(b)(1) is a reasonable interpretation of the provision's requirements. Although a distributor's good faith belief is one of the six requirements to qualify for the guaranty exemption from liability under § 12(b)(1), it is not the only factor required and it is not by itself sufficient to escape liability.

Further, Sultan cites no authority for the proposition that the purpose of the guaranty provision is to shift liability to deceitful manufacturers. The guaranty provision must be construed in accordance with, and not inconsistent with, the purpose of FIFRA's registration program to protect human health and the environment from risks associated with pesticides. Accordingly, the EPA may rigorously enforce FIFRA against the distributor if the requirements of the guaranty provision have not been met. Such a system of enforcement is designed to encourage all parties to make additional efforts to ensure registration as required by the statute. The guaranty provision releases an innocent distributor who reasonably relies on the written assurances of the products' manufacturers but it does not shield the distributor of pesticides from the responsibility of ensuring to the extent possible that the manufacturer has complied with FIFRA's requirements. We see no reason to reject the EAB's interpretation of § 12(b)(1) which places responsibility on the distributor, thereby providing additional protection for the consumer.

The EPA and the EAB both state that it is a matter of first impression in the federal courts whether a distributor who intended to obtain a guaranty that the product was registered can be excused from this requirement by a good faith belief that it was in fact registered. We agree with their position that unless all of the requirements of the guaranty provision have been met, the distributor does not qualify for an exemption of liability. Accordingly, we will affirm the EAB's decision that the Agreement, coupled with Sultan's apparent intention to obtain a guaranty, does not satisfy the requirements for a guaranty under FIFRA § 12(b)(1).

## B. *Course of Dealing*

Sultan sought to rely on extrinsic evidence pertaining to its dealings with HCP and Meditox in an effort to show that "the parties clearly intended for the guarantees in the Agreement to apply to the entire Product Line." Br. of Petitioner at 15. It argues that the testimony of Seid and Kaszovitz, the draft labels for some of the Products, and the advertising material provided by Meditox show the intent of the parties to the Agreement. It cites Florida law holding that in interpreting a contract, it is necessary to first ascertain the parties' intent and references the statement of the Florida Supreme Court that "[c]ontracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish." *St. Lucie County Bank & Trust Co. v. Aylin,* 94 Fla. 528, 114 So. 438, 441 (1927) (quotations and citations omitted).

The EPA responds that even under Florida law Sultan can only introduce extrinsic evidence of a course of dealing or performance if the language of the Agreement is ambiguous. *See Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So.2d 1000, 1002 (Fla.Dist.Ct.App.1995) (citing *Boat Town U.S.A.*, 364 So.2d at 17). Sultan does not contend that the Agreement was ambiguous as its position is that it clearly created a guaranty for all of the Products. Thus, the EPA contends that Sultan had no basis for introducing extrinsic evidence.

Moreover, the EPA continues, even if the Agreement were ambiguous, the EAB correctly determined that Sultan's extrinsic evidence is insufficient to establish a course of dealing or performance. "Course of dealing" refers specifically to conduct preceding the formation of the contract. "Course of performance" refers to conduct following contract formation. The EPA points out that the advertising material and several of the draft labels were not dated, and therefore could not be used as specific evidence of conduct occurring either before or after the contract formation. Also, the EAB's finding that Sultan sent several draft labels to HCP, App. at 442–46, that contained false registration numbers, App. at 61–62, undermines Sultan's argument that it received materials that represented proper EPA registration.

■ Perhaps most important is the EPA's argument that Sultan's reliance on the extrinsic evidence is misplaced because, under Florida law, extrinsic evidence may be considered "not to vary the terms of the contract, but to explain, clarify or elucidate the ambiguous language." *Vienneau v. Metro. Life Ins. Co.*, 548

So.2d 856, 859 (Fla.Dist.Ct.App.1989). *See* Fla.Stat. § 672.202(1). Inasmuch as the Agreement does not contain a clear, written guaranty as to the registration of the four unregistered products, the only purpose of the extrinsic evidence would be to vary, rather than to simply explain, the Agreement terms. It follows that the EAB did not abuse its discretion in determining that the extrinsic evidence offered by Sultan was insufficient to alter the PO's interpretation of the Agreement.[6]

## C. *Penalty*

■ Much of Sultan's remaining argument is directed to the parties' intent in establishing a guaranty that met the requirement of § 12(b)(1). As we concluded above, Sultan's intent, even if innocent, cannot transform the language of the Agreement into something that it is not. Such intent, even if not relevant to liability, may be relevant to the penalty. Sultan argues that if it is not protected by the FIFRA guaranty provision, its good faith, noted by the PO, makes the penalty the PO assessed against it unconscionable, inequitable, and unwarranted. Sultan states that the mitigating factors identified by the PO warrant a much larger reduction in the penalty than the eleven-percent reduction that was granted. According to Sultan, under the assessment procedure followed in this case, virtually any offender will be penalized the maximum amount allowed by law. This is hardly a persuasive argument inasmuch as the PO reduced Sultan's penalty by approximately sixty percent from the maximum amount allowed ($445,000 to $175,000) based on various mitigating factors.

---

**6.** In light of our disposition, we need not decide the extent to which state law is relevant in the determination whether an Agreement meets the requirement of § 12(b)(1), a strict liability statute.

■ The EPA is charged with choosing the means by which to enforce and achieve the goals of FIFRA. In such a case, heightened deference is due to the agency's penalty assessment. *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (*citing Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112, 67 S.Ct. 133, 91 L.Ed. 103 (1946)). FIFRA requires the EPA to consider three factors in assessing a penalty: (1) the gravity of the violation; (2) the size of the business; and (3) the ability to pay. 7 U.S.C. § 1361(a)(4). The PO took these factors into account. The PO also applied the FIFRA Enforcement Policy to guide his interpretation of the statutory penalty factors. Sultan offers no evidence to show that the PO went beyond the bounds of the FIFRA penalty scheme. A review of the EAB's analysis shows that the PO's interpretation of these factors was based on a permissible construction of the statute. App. at 70–79. It should therefore be given deference. *See Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ The EAB interpreted the "gravity" factor as including the ideas of risk, harm, and culpability, which is reasonable given that the purpose of the FIFRA registration program is to protect against the risk of harm from pesticide products. The EPA explains that there are significant risks from the distribution of unregistered pesticides, because, for example, the liquid form of a pesticide may be more readily absorbed through the skin than if the pesticides were in granular form, causing more adverse effects. Br. of Respondent at 6. On a scale of 1 (lowest) to 4 (highest), the PO assigned Sultan a score of 2 for gravity and score of 2 for culpability. We have no basis to interfere with these evaluations. The products were to be used to disinfect dental equipment, and distribu-

tion of an ineffective pesticide could cause harm both to dentists and patients. The score reflects the PO's decision that Sultan was not as careful as the law requires. In particular, Kaszovitz, Sultan's lawyer, admitted that he had never read FIFRA, nor had he considered it when drafting the Agreement. App. at 320. This lack of diligence is compounded by the fact that Sultan has held EPA pesticide registrations since 1973 and should have been quite familiar with the process involved. App. at 636–37.

Similarly reasonable was the PO's determination of Sultan's "size of business" in terms of its gross annual revenues. A company's revenue indicates the amount of resources it can allocate to regulatory compliance programs. Sultan's gross annual revenues were calculated as being greater than $1,000,000, and the PO determined Sultan could have been expected to comply with all EPA requirements.

In determining Sultan's ability to pay the penalty, the PO considered Sultan's average gross sales in the years 1990–1993, a method set out in the FIFRA Enforcement Policy. Sultan argues that its penalty is inappropriate because its net income was only $27,000 for 1997. The PO found, however, that Sultan's assets exceeded its liabilities by $1,500,000. App. at 25. Further, the penalties were calculated based on Sultan's gross income rather than its net income. App. at 582. The PO found that Sultan's gross income provided sufficient revenue to pay the reduced penalty.

Finally, the PO exercised his discretion in reducing the penalty by an additional eleven percent to $175,000. This reduction was based on three additional factors: that Sultan was not the manufacturer; that Sultan did not intentionally break the law; and that Sultan thought the guaranty covered all of the pesticides. Although these

factors are not expressly included in the statute, the PO did not abuse his discretion in considering them and in denying a larger reduction.

The final penalty of $175,000 is well within the limits set by FIFRA. Sultan has offered no evidence to show an abuse of discretion by either the PO or the EAB at any point during the penalty calculation process.

## IV.

## CONCLUSION

For the reasons set forth, we will deny the Petition for Review with respect to the EAB's determination of Sultan's liability and its penalty assessment.