**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RESISTING ENVIRONMENTAL DESTRUCTION ON INDIGENOUS LANDS, REDOIL; ALASKA WILDERNESS LEAGUE; CENTER FOR BIOLOGICAL DIVERSITY; NATURAL RESOURCES DEFENSE COUNCIL; NORTHERN ALASKA ENVIRONMENTAL CENTER; OCEANA; PACIFIC ENVIRONMENT; SIERRA CLUB; THE WILDERNESS SOCIETY, *Petitioners,* | No. 12-70518 AMENDED OPINION |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *Respondent*, | |
| SHELL GULF OF MEXICO INC.; SHELL OFFSHORE INC., *Respondents-Intervenors*. | |

On Petition for Review of an Order of the
Environmental Protection Agency
Environmental Appeals Board

Argued and Submitted
August 28, 2012—Anchorage, Alaska

Filed December 26, 2012
Amended April 23, 2013

Before: Michael Daly Hawkins, M. Margaret McKeown,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge McKeown

**SUMMARY**[*]

**Environmental Law**

The panel denied a petition for review, and upheld a decision of the Environmental Protection Agency granting two air permits authorizing exploratory drilling operations in the Arctic Ocean by a drillship and its associated fleet of support vessels.

The panel upheld the EPA's statutory and regulatory interpretations. Specifically, the panel held that the Clean Air Act is ambiguous as to the applicability of the best available control emissions to support vessels not attached to an Outer Continental Shelf source, and concluded under *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), deference that the EPA's construction of the statute was permissible and reasonable. The panel also held that the EPA's grant of a 500 meter ambient air exemption was not plainly erroneous or inconsistent with the EPA's regulations.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Colin C. O'Brien (argued), Earthjustice, Anchorage, Alaska; Eric P. Jorgensen, Earthjustice, Juneau, Alaska, for Petitioners.

Ignacia S. Moreno, Daniel Pinkston (argued), Alan D. Greenberg, United States Department of Justice, Denver, Colorado, for Respondent.

Kathleen M. Sullivan (argued), William B. Adams, David S. Mader, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; Duane A. Siler, Sarah C. Bordelon, Tony G. Mendoza, Crowell & Moring LLP, Washington, D.C., for Intervenors-Respondents.

Lisa E. Jones, Samuel B. Boxerman, and James R. Wedeking, Sidley Austin, LLP, Washington, D.C., Mara E. Zimmerman, Washington, D.C., for Amicus Curiae American Petroleum Institute.

Cameron M. Leonard, Office of the Attorney General, Fairbanks, Alaska, for Amicus Curiae State of Alaska.

**OPINION**

McKEOWN, Circuit Judge:

Since 1990, the Environmental Protection Agency ("EPA") has been responsible for regulating air pollution from offshore sources on the Outer Continental Shelf ("OCS") under the Clean Air Act ("the Act"). 42 U.S.C. § 7627. We consider here whether the EPA's Environmental

Appeals Board ("EAB") properly upheld two air permits authorizing exploratory drilling operations in the Arctic Ocean by a drillship and its associated fleet of support vessels. The petition for review challenges two aspects of the permits: (1) the determination that support vessels, unlike the drillship itself, do not require the best available control technology ("BACT") to control emissions; and (2) the exemption of the area within a 500-meter radius of the drillship from ambient air quality standards.

The application of BACT to support vessels requires us to reconcile conflicting provisions of the Act. In doing so, under *Chevron U.S.A., Inc. v. NRDC, Inc.*, we defer to the EAB's reasonable interpretation of those provisions and related regulations. 467 U.S. 837 (1984). Likewise, we evaluate whether the EAB's decision on the ambient air boundary is a permissible application of the EPA's regulations. In both cases, we uphold the EPA's statutory and regulatory interpretations, and we deny the petition.

## I.  BACKGROUND

Shell Gulf of Mexico, Inc. and Shell Offshore, Inc. (collectively "Shell") purchased lease blocks[1] in the Chukchi and Beaufort Seas off the North Slope of Alaska for oil and gas exploration. Shell plans to conduct this exploration via its drillship, the *Discoverer*, along with an associated fleet of support vessels, including icebreakers, oil spill response vessels, and a supply ship. As required by the Act, Shell applied for permits to emit pollutants in connection with its

---

[1] Outer Continental Shelf lease blocks are defined geographic areas over the outer continental shelf that identify federal land ownership and facilitate the management of offshore resources.

exploration activities. The EPA granted the permits, which were upheld in two administrative appeals to the EAB. Petitioners, Resisting Environmental Destruction on Indigenous Lands, an environmental organization, and other environmental groups (collectively "REDOIL"), challenge the permits on the basis that they do not satisfy the Act's air permit requirements. Shell intervened to oppose REDOIL's petitions.

Two permits are at issue, one for operation in the Chukchi Sea and the other for the Beaufort Sea. The permits allow Shell, subject to conditions, to construct and operate its *Discoverer* drillship and use its associated fleet for exploratory drilling activities between July 1 and November 30 each year. The Chukchi permit underwent two rounds of notice-and-comment before it was issued in March 2010. The Beaufort permit underwent one round of notice-and-comment before it was issued in April 2010. The EAB addressed the two permits together in the administrative proceedings that followed.

Under the permits, Shell must apply BACT—consisting of specific technologies selected by the EPA, such as good combustion practices, a particular ventilation system, or a type of fuel—to limit the emissions of specific pollutants subject to regulation under the Act. Central to this appeal, the EPA determined that BACT applies to the *Discoverer* when it is attached to the seabed at a drill site by at least one anchor, and to any vessel that is tied to the *Discoverer* under that condition. In short, the permits require Shell to comply with technological requirements for the *Discoverer* and the supply vessel whenever it is tied to the *Discoverer*. However, the permits do not prescribe technological requirements for

the remaining vessels in the associated fleet because they will not be physically attached to the *Discoverer*.

REDOIL appealed the approval of the permits to the EAB, seeking to have BACT applied to the entire associated fleet whenever it is operating within 25 miles of the *Discoverer*, regardless of whether the vessels are tied to the drillship.    REDOIL argued that § 7627 establishes an "unambiguous mandate" requiring the EPA to do so.  Citing ambiguity in § 7627's requirements, the EAB denied review in December 2010, but remanded for reasons not at issue here. *In re: Shell Gulf of Mexico, Inc. & Shell Offshore, Inc.*, 2010 WL 5478647 (E.P.A. Dec. 30, 2010).

On remand, the EPA issued revised air permits in September 2011.  The revised permits allow the *Discoverer* an area with a 500-meter radius, measured from the center of the drillship, that is exempt from "ambient air" standards. The exemption is conditioned on the United States Coast Guard's establishment of an effective safety zone that prohibits members of the public from entering the area.  Shell must also develop and implement a public access control program to (1) notify the general public of the prohibition on entering the safety zone, and (2) communicate to North Slope communities relevant information about exploration operations, such as timing and location.

REDOIL appealed the revised permits to the EAB, this time targeting the ambient air exemption.  REDOIL urged that the exemption contravened both the definition of "ambient air" in the EPA's regulations and the agency's longstanding interpretation of those regulations.  The EAB dismissed this second round of appeals in a January 2012 order, noting that ambient air exemptions are determined on

a case-by-case basis. *In re: Shell Gulf of Mexico, Inc. & Shell Offshore, Inc.*, 2012 WL 119962, at \*27 (E.P.A. Jan. 12, 2012). The permits became effective on January 27, 2012. Notice of Approval of Clean Air Act Outer Continental Shelf Permits Issued to Shell Gulf of Mexico, Inc., and Shell Offshore, Inc. for the Discoverer Drillship, 77 Fed. Reg. 7148, 7148 (Feb. 10, 2012).

REDOIL now seeks review of both the December 2010 EAB ruling declining to apply BACT to the entire associated fleet and the January 2012 EAB ruling on the 500-meter ambient air exemption.

## II.  APPLICATION OF  BACT TO THE ASSOCIATED FLEET

### A.  STATUTORY FRAMEWORK

Enacted in 1970, the Clean Air Act established a comprehensive program to protect and enhance air quality by limiting emissions from both stationary industrial sources and mobile sources. 42 U.S.C. § 7401 *et seq*. Central to this legislation are national air standards, known as "National Ambient Air Quality Standards" ("NAAQS"), set by the EPA for pollutants considered harmful to public health and the environment. 42 U.S.C. §§ 7408–10. The Act has been significantly amended twice, in 1977 and 1990. Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990). The Prevention of Significant Deterioration ("PSD") program and its related BACT requirement were first included in the 1977 amendment, which dealt with onshore sources of air pollution. 42 U.S.C. §§ 7470–7492. The PSD program was later applied to offshore sources on the OCS through the 1990

amendment. 42 U.S.C. § 7627. The extent to which BACT applies to an associated fleet turns on the interaction between the two amendments.

The 1977 amendment directed that major new stationary sources of pollution and major existing stationary sources that are being significantly modified must obtain preconstruction permits through a process called New Source Review. PSD is the New Source Review program for areas with relatively clean air—those areas that the EPA designates as in "attainment" with NAAQS or as "unclassifiable" due to insufficient data. 42 U.S.C. § 7471. The program's purpose is to protect the public from any adverse health or welfare effects of air pollution that may occur despite achievement of NAAQS, and to require careful evaluation of all consequences of new industrial development. 42 U.S.C. § 7470(1), (5).

Under the PSD program, "[n]o major emitting facility" "may be constructed" without a conforming permit. 42 U.S.C. § 7475(a)(1). "Major emitting facility" is defined, in part, as a "stationary source[] of air pollutants" with the potential to emit certain threshold levels of specified air pollutants subject to regulation. 42 U.S.C. § 7479(1). To obtain a PSD permit, such a facility must, among other things, satisfy two independent requirements. The first requirement concerns emissions: the owner or operator of the major emitting facility must conduct air quality analyses demonstrating that emissions from the facility will not cause or contribute to air pollution in violation of various air quality standards. 42 U.S.C. § 7475(a)(3). The second requirement, and the one at issue here, concerns technology: "the proposed facility is subject to the best available control technology for each pollutant subject to regulation" emitted from such

facility.  42 U.S.C. § 7475(a)(4).  The obligation to apply BACT requires the EPA to select emission control technologies that result in the maximum reduction of specified pollutants in view of "energy, environmental, and economic impacts and other costs."  42 U.S.C. § 7479(3).

The 1990 amendment extended the applicability of the PSD requirements beyond major onshore stationary sources of air pollution.  As a result of the 1990 amendment, the EPA, for the first time, was given jurisdiction to regulate OCS sources "located offshore of the States along the Pacific, Arctic and Atlantic Coasts" and certain areas of the Gulf Coast.  42 U.S.C. § 7627(a)(1).  To achieve the goals of the PSD program, Congress directed the EPA to "establish requirements" so that OCS sources would attain and maintain ambient air quality standards and comply with the PSD program.  *Id.*

A key provision of § 7627 is the definition of the term "Outer Continental Shelf source," which means "any equipment, activity, or facility" that "(i) emits or has the potential to emit any air pollutant, (ii) is regulated or authorized under the Outer Continental Shelf Lands Act [("OCSLA"), 43 U.S.C. § 1331 et seq.], and (iii) is located on the Outer Continental Shelf or in or on waters above the Outer Continental Shelf."   42 U.S.C. § 7627(a)(4)(C). Significantly, jurisdiction under OCSLA extends only to "the subsoil and seabed of the outer Continental Shelf and . . . all installations and other devices permanently or temporarily attached to the seabed."  43 U.S.C. § 1333(a)(1).   The statutory definition of "OCS source" additionally directs that, "[f]or purposes of this subsection, emissions from any vessel servicing or associated with an OCS source, including emissions while at the OCS source or en route to or from the

OCS source within 25 miles of the OCS source, shall be considered direct emissions from the OCS source." 42 U.S.C. § 7627(a)(4)(C)(iii).

In follow-on regulations adopted in 1992, the EPA incorporated sections (i), (ii) and (iii) of the statutory definition of "OCS source" and added that it would include vessels only when "(1) [p]ermanently or temporarily attached to the seabed," or "(2) [p]hysically attached to an OCS facility, in which case only the stationary sources aspects of the vessels will be regulated." 40 C.F.R. § 55.2.

### B. THE CLEAN AIR ACT IS AMBIGUOUS AS TO BACT'S APPLICATION TO ASSOCIATED VESSELS NOT ATTACHED TO AN OCS SOURCE

We next consider whether the Act clearly and unambiguously requires the application of all aspects of the PSD program, including BACT, to associated vessels operating within 25 miles of the OCS source, regardless of whether they are tied to the OCS source, as urged by REDOIL. In contrast, the EPA and Shell argue that the statute is ambiguous and that we owe deference to the EPA's permissible construction that BACT applies to the *Discoverer*, which is a stationary OCS source, but not to mobile support vessels unattached to the drillship.

To interpret the statute, we look first to the statute's "language itself [and] the specific context in which that language is used." *McNeill v. United States*, 131 S. Ct. 2218, 2221 (2011) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (internal quotation marks omitted)). If "the [expressed] intent of Congress is clear," then the court and the agency "must give effect to [that] unambiguously

expressed intent." *Chevron*, 467 U.S. at 842–43.    If, however, "Congress has not directly addressed the precise question at issue," then we must not "simply impose [our] construction on the statute, as would be necessary in the absence of an administrative interpretation," but rather ask "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

An additional question is whether the EAB's interpretation deserves *Chevron* deference.    Congress explicitly granted to the EPA the authority to promulgate regulations and grant air permits for activities on the OCS. The EPA exercised that authority through a formal process that included multiple rounds of public notice and comment, various petitions for administrative review, and two reasoned EAB decisions upholding the air permits at issue.  We join our sister circuits in concluding that the EAB proceeding is a formal adjudication that warrants *Chevron* deference.  *See In re Lyon Cnty. Landfill*, 406 F.3d  981, 984 (8th Cir. 2005) ("EAB decisions . . . are formal adjudications consistent with the Administrative Procedure Act . . . , and due *Chevron* deference.") (citing *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)); *Sultan Chemists, Inc. v. EPA*, 281 F.3d 73, 79 (3d Cir. 2002) (holding that an EAB proceeding is a formal adjudication to which courts should defer under *Mead* if the statutory language is ambiguous); *Piney Run Pres. Ass'n v. Cnty. Com'rs of Carroll Cnty.*, 268 F.3d 255, 267–68 (4th Cir. 2001) (noting that an earlier EAB decision articulating a reasonable statutory interpretation is entitled to *Chevron* deference).  *Chevron* deference also extends to the EAB's interpretation of the Clean Air Act, which is administered by the EPA.

It is useful to begin with what is clear and undisputed, both in the statute and by the parties. Under a plain reading of the statute, the PSD program and the BACT requirement apply to an "Outer Continental Shelf source." 42 U.S.C. § 7627(a)(1) (The EPA is required to "control air pollution from Outer Continental Shelf sources" by establishing requirements to ensure that such sources "comply with the provisions of part C of subchapter I of this chapter [the PSD program]." ). The *Discoverer*, when it is attached to the seabed by an anchor, is an OCS source. Additionally, an associated vessel that is tied to the *Discoverer* while it is anchored to the seabed also becomes an OCS source because it is "[p]hysically attached to an OCS facility," an alternative way to qualify as an OCS source under the EPA's regulatory definition. 40 C.F.R. § 55.2. However, support vessels that are not "[p]ermanently or temporarily attached to the seabed," or "[p]hysically attached to an OCS facility," are not "regulated or authorized under the Outer Continental Shelf Lands Act" and thus cannot be an OCS source under the statute or under the EPA's regulatory definition. *See* 40 C.F.R. § 55.2; 43 U.S.C. § 1333(a)(1); 42 U.S.C. § 7627(a)(4)(C)(ii). Congress therefore did not express an intention to regulate associated vessels as OCS sources, or to apply BACT to associated vessels on that basis.

Here is the rub. Section 7627 also provides that "[f]or purposes of this subsection, emissions from any vessel servicing or associated with an OCS source, including emissions while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source, shall be considered direct emissions from the OCS source." 42 U.S.C. § 7627(a)(4)(C)(iii). REDOIL elliptically argues, based on this "direct emissions" clause, that Congress intended to apply all PSD requirements, including BACT, to

support vessels operating within 25 miles of the OCS source, thereby effectively turning such support vessels into "OCS sources." However, that conclusion does not follow unambiguously from the statutory language because the direct emissions clause does not redefine "OCS source."

The statute does *not* instruct that "any vessel servicing or associated with an OCS source" "while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source" *shall be considered an OCS source*. Rather, the direct emissions clause maintains a distinction between an OCS source, to which all PSD requirements apply, and vessels servicing an OCS source, to which unspecified requirements apply because their emissions must be considered direct emissions from the OCS source. As noted in the EAB decision, § 7627 provides no further explanation as to why emissions from associated vessels should be considered direct emissions from the OCS source or to what effect. *See In re: Shell Gulf of Mexico*, 2010 WL 5478647, at *12. Thus, Congress gave conflicting signals by clearly and unambiguously excluding the associated fleet from the definition of "OCS source" and yet including the associated fleet's emissions as direct emissions of the OCS source.

The Act's structure provides a further wrinkle suggesting that associated vessels may be treated differently from an OCS source. The PSD program is found in Title I of the Act, which governs major stationary sources such as industrial plants, while mobile sources such as motor vehicles are regulated separately by Title II. 42 U.S.C. §§ 7401–7515; *id.* at §§ 7521–7590. By definition, a "stationary source" excludes any source of "emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle." 42 U.S.C.

§ 7602(z). The EPA's regulations in turn define "marine engine" as "a nonroad engine that is installed or intended to be installed on a marine vessel." 40 C.F.R. § 89.2. Reading § 7627 within the context of the PSD provisions points to the conclusion that PSD requirements should apply to stationary sources on the OCS, but not mobile marine vessels. We agree with the EAB ruling that this distinction between stationary and mobile sources is consistent with application of BACT to installations attached to the seabed but not to vessels, such as those in the associated fleet, moving freely in the waters above the OCS. *In re: Shell Gulf of Mexico*, 2010 WL 5478647, at *14. Whether Congress expressed an intention that BACT were to apply to associated vessels that are not attached to an OCS source is, at the very least, ambiguous.

REDOIL ironically resorts to legislative history in an effort to *avoid* ambiguity. However, were the statutory language clear, as REDOIL posits, reference to the legislative history would be both unnecessary and inappropriate to illuminate unambiguous text. *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."); *Barnhill v. Johnson*, 503 U.S. 393, 401 (1992) ("[A]ppeals to statutory history are well taken only to resolve statutory ambiguity.") (internal quotation marks omitted).

Of course, in the case of an ambiguous statute, we may consider legislative history. *See, e.g.*, *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2011) ("If the proper interpretation is not clear from this textual analysis, the legislative history offers valuable guidance and insight into Congressional intent.") (internal quotation marks and citation omitted). But in this case, the legislative history of § 7627

offers no useful guidance as to congressional intent. A report submitted during the floor debate in the House of Representatives stated that "[m]arine vessels emissions . . . which are associated with an OCS activity, will be included as part of the OCS facility emissions for the purposes of regulation," so as to "ensure that the cruising emissions from marine vessels are controlled and offset as if they were part of the OCS facility's emissions." 136 Cong. Rec. H12,848 (daily ed. Oct. 26, 1990) (report submitted by Rep. Robert Lagomarsino); *see also* 136 Cong. Rec. S16,895 (daily ed. Oct. 27, 1990) (conference report submitted by Senator Max Baucus). Without referencing BACT or explaining what it means to be regulated "as part of the OCS facility emissions," it is impossible to discern if Congress specifically considered the question of whether BACT applies to associated vessels in the same manner and to the same degree as an OCS source itself. We agree with the EAB that the legislative history merely "shows that Congress intended vessel emissions to be 'controlled,' 'offset,' 'mitigated,' or subject to 'regulation,' all of which are accomplished to some degree" by the EPA's interpretation of § 7627. *In re: Shell Gulf of Mexico*, 2010 WL 5478647, at *15.

Neither does the fact that Congress enacted § 7627 after the D.C. Circuit's decision in *NRDC, Inc. v. EPA* resolve the provision's ambiguity, as REDOIL posits. 725 F.2d 761 (D.C. Cir. 1984). In that case, the D.C. Circuit upheld the EPA's revocation of regulations treating emissions produced by ships moving to or from a marine terminal as "secondary emissions" of the terminal itself, meaning that such emissions would be counted toward the marine terminal for various purposes, including the PSD program's air quality impact analysis. *Id.* at 766, 772–73. However, the court's acceptance of the EPA's revocation of the "secondary

emissions" regulation, which the agency lacked authority to promulgate in the first place, sheds little light on Congress's intent in later employing the term "direct emissions" in the OCS provisions. It hardly follows that Congress's use of "direct emissions" as opposed to "secondary emissions" manifested a clear intent to subject "direct emissions" to the full suite of PSD requirements.

## C. EPA's Interpretation of 42 U.S.C. § 7627 is Reasonable

Because the Clean Air Act is ambiguous as to the applicability of BACT to support vessels not attached to an OCS source, our task is to assess whether the agency's construction of the statute is "permissible" or "reasonable." *Chevron*, 467 U.S. at 843–44. In its December 2010 ruling, the EAB concluded that it is permissible to apply BACT to support vessels only insofar as they are attached to the *Discoverer* because § 7627 "simply does not contain any words expressly, or by implication, explaining why the statute distinguishes between the OCS source and vessels servicing the OCS source when directing that such vessels' emissions shall be considered direct emissions from the OCS source." *In re: Shell Gulf of Mexico*, 2010 WL 5478647, at *2. We agree with the EAB's characterization of the ambiguity.

The EAB reconciled this ambiguity in two ways. First, the associated fleet's emissions provide a baseline for triggering PSD requirements. Emissions from the entire associated fleet and the *Discoverer* were used to determine whether the drillship met the threshold of having the potential to emit two hundred and fifty tons or more of regulated air pollutants, thereby subjecting the drillship to PSD requirements. This approach followed the EPA's rationale in

its OCS rulemaking. Having determined that, under OCSLA, it could not regulate vessels other than drillships and vessels attached to the drillship as "OCS sources," the EPA explained that emissions from the associated fleet are "accounted for by including vessel emissions in the 'potential to emit.'" Outer Continental Shelf Air Regulations, 56 Fed. Reg. 63,774, 63,777 (Dec. 5, 1991). This interpretation gives meaning to the "direct emissions" language—by including the associated fleet's emissions "while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source" toward the drillship itself—while respecting the limitations imposed by the definition of OCS source.

The emissions from the entire fleet were also attributed to the OCS source in a second way—in assessing whether the *Discoverer* would cause a violation of various air quality standards, one of the PSD requirements. In granting the PSD permits, the EAB thus imposed conditions that incorporated the emissions of the associated fleet but found that "the Associated Fleet [except for a supply vessel] will not be physically attached to the *Discoverer* and therefore will not be part of the OSC source and not subject to the BACT requirements."

The EAB's approach is consistent with the D.C. Circuit's decision in *Santa Barbara Cnty. Air Pollution Control Dist. v. EPA*, which upheld EPA regulations refusing to regulate in-transit maritime vessels as OCS sources. 31 F.3d 1179 (D.C. Cir. 1994). The court held that "it was reasonable for the EPA to conclude that OCS sources did not include vessels that were merely traveling over the OCS." *Id.* at 1181.

In sum, we conclude that while the BACT requirement clearly applies to an OCS source, the statute is ambiguous as

to application of BACT to associated vessels within 25 miles of an OCS source. We defer to the EPA's reasonable construction of the statute, as adopted by the EAB, that BACT does not apply to mobile support vessels unattached to the drillship.

### III.    EPA's Grant of a 500 meter Ambient Air Exemption is not plainly erroneous or inconsistent with the agency's regulations

In the revised air permits issued in September 2011, the EPA granted Shell's request for a 500-meter radius "ambient air" exemption. The EAB, in its January 2012 decision, upheld this exemption, which allows Shell to assess compliance with air quality standards at a distance of 500 meters from the center of the drillship. *In re: Shell Gulf of Mexico*, 2012 WL 119962. Air quality impacts within the 500-meter radius are not subject to analysis or regulation. The exemption is contingent on the Coast Guard's establishment of an effective safety zone precluding public access to the area, and Shell's development and implementation of a public access program.

According to the Supreme Court, "'ambient air' [] is the statute's term for the outdoor air used by the general public." *Train v. NRDC, Inc.*, 421 U.S. 60, 65 (1975). Curiously, the Clean Air Act does not define "ambient air," but the EPA's regulations define the term as "that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. § 50.1(e). The agency has occasionally exempted certain areas from being labeled ambient air. The parties agree that the agency's "longstanding interpretation" of this exemption is described in a 1980 letter from former EPA Administrator Douglas Costle. That letter states that an

"exemption from ambient air is available only for the atmosphere over land owned or controlled by the source and to which public access is precluded by a fence or other physical barriers."

The Supreme Court instructs that an agency's interpretation of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). The relevant inquiry is whether the EPA's grant of the ambient air exemption to Shell is plainly erroneous or inconsistent with its regulatory definition of ambient air.

It is obvious that the exemption here is not "for the atmosphere over *land* owned or controlled by the source and to which public access is precluded by a fence or other physical barriers" (emphasis added).  However, neither is the exemption inconsistent with the EPA's regulatory definition of ambient air or clearly erroneous.  The essence of the EPA's regulatory definition links ambient air to public access.  Because the EPA conditioned Shell's permit and ambient air exemption on the establishment of an effective safety zone that precludes public access, the grant is consistent with the regulation.

Further, the EPA has not impermissibly departed from its longstanding regulatory interpretation of "ambient air" without explanation or justification, as REDOIL claims.  We are persuaded by the EAB's reasonable explanation that Costle's 1980 letter prescribing a fence or other physical barrier to preclude public access was "clearly written with overland situations in mind." *In re: Shell Gulf of Mexico*, 2012 WL 119962, at *29.  The agency did not have the

occasion to consider how it might apply the exemption in the context of open waters until ten years later, when Congress first gave the EPA jurisdiction to regulate air pollution from OCS sources.  The EAB's assessment that the agency "requires some leeway" in determining how to apply "the regulation and the interpretive letter to an 'overwater' situation" is just common sense. *Id*.  Constructing a fence in the Arctic Ocean would make little sense, and the EPA has previously recognized a safety zone established by the Coast Guard as evidence of sufficient ownership or control over open water areas to qualify as a boundary for defining ambient air.  Here, as in that precedent, the EPA imposed conditions that approximated the criteria in the Costle letter—control of property and limited public access—for a marine environment.  We conclude that the EPA's grant of an ambient air exemption to Shell conditioned on an effective safety zone excluding the public is a permissible interpretation of its ambient air regulation and earlier letter ruling.

**PETITION DENIED.**