**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALASKA WILDERNESS LEAGUE;
CENTER FOR BIOLOGICAL
DIVERSITY, INC.; GREENPEACE, INC.;
NATIONAL AUDOBON SOCIETY, INC.;
NATURAL RESOURCES DEFENSE
COUNCIL, INC.; OCEAN
CONSERVANCY, INC.; OCEANA, INC.;
PACIFIC ENVIRONMENT AND
RESOURCES CENTER; REDOIL, INC.;
SIERRA CLUB,
            *Plaintiffs-Appellants*,

v.

SALLY JEWELL, Secretary of the
Interior; BRIAN SALERNO, Director
of Bureau of Safety and
Environmental Enforcement; MARK
FESMIRE, Regional Director of
Bureau of Safety and Environmental
Enforcement, Alaska Region,
            *Defendants-Appellees*,

SHELL GULF OF MEXICO INC.; SHELL
OFFSHORE INC.,
    *Intervenor-Defendants–Appellees*.

No. 13-35866

D.C. Nos.
3:12-cv-00048-
RRB
1:12-cv-00010-
RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Chief District Judge, Presiding

Argued and Submitted
August 13, 2014—Anchorage, Alaska

Filed June 11, 2015

Before: Jerome Farris, Dorothy W. Nelson,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen;
Dissent by Judge D.W. Nelson

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of federal defendants and Shell Gulf of Mexico, Inc. and Shell Offshore Inc. in an action brought by environmental groups alleging that the Bureau of Safety and Environmental Enforcement acted unlawfully in approving two of Shell's oil spill response plans for its oil leases in the Beaufort and Chukchi Seas on Alaska's Arctic coast.

The panel held that the Bureau's approval of Shell's oil spill response plans was not arbitrary, capricious, or

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

otherwise not in accordance with law under the Administrative Procedures Act.

Concerning the plaintiffs' contention that the Bureau should have engaged in Endangered Species Act consultation before approving the plans, the panel applied *Chevron* analysis to the Clean Water Act provisions. At *Chevron* Step One, the panel held that the relevant portions of the Clean Water Act were ambiguous; and at *Chevron* Step Two, the panel held that the Bureau's interpretation of the provisions was reasonable. The Bureau interpreted the provisions to conclude that Congress limited the Bureau's discretion to only reviewing an oil spill response plan to determine if it met the six enumerated requirements of 33 U.S.C. § 1321(j)(5)(D), and the implementing regulations. According deference to the Bureau's interpretation of the Clean Water Act and its own regulations, the panel held that the Bureau lacked discretion to deny approval once it determined that the oil spill response plans satisfied the statutory requirements. The panel concluded that the Bureau's approval of the plans was a nondiscretionary act that did not trigger a requirement for interagency consultation under the Endangered Species Act.

The panel rejected plaintiffs' contention that the Bureau violated the National Environmental Policy Act by failing to prepare an Environmental Impact Statement before approving the plans. The panel held that the Bureau reasonably concluded that it must approve any plan that met the statutory requirements of the Clean Water Act. The panel concluded that the Bureau's approval of Shell's plans was not subject to the requirements of the National Environmental Policy Act.

Judge D.W. Nelson dissented. Judge Nelson concurred with the majority that the Bureau did not act in an arbitrary or capricious manner in approving the plans, but dissented from the remainder of the majority opinion. Judge Nelson would hold that the Bureau was required to engage in Endangered Species Act consultation, and conduct analysis pursuant to the National Environmental Policy Act, and she would reverse the summary judgment accordingly.

## COUNSEL

Holly A. Harris (argued), Brettny E. Hardy, and Eric P. Jorgensen, Earthjustice, Juneau, Alaska, for Plaintiffs-Appellants.

Maggie B. Smith (argued), Attorney; Robert G. Dreher, Acting Assistant Attorney General, and David B. Glazer, Bridget Kennedy McNeil, Kent E. Hanson, and David C. Shilton, Attorneys, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Sarah Doverpike, Office of the Solicitor, Department of the Interior, Washington, D.C., for Defendants-Appellees Sally Jewell, Brian Salerno, and Mark Fesmire.

Kathleen Sullivan (argued), William B. Adams, and David S. Mader, Quinn Emmanuel Urquhart & Sullivan LLP, New York, New York; Kyle W. Parker, Crowell & Moring LLP, Anchorage, Alaska, for Intervenors-Defendants–Appellees.

**OPINION**

NGUYEN, Circuit Judge:

Shell Gulf of Mexico Inc. and Shell Offshore Inc. (collectively "Shell") for many years have sought to develop offshore oil and gas resources in the remote Beaufort and Chukchi seas on Alaska's Arctic coast. Shell secured leases for the Beaufort Sea in 2005 and 2007, and the Chukchi Sea in 2008, but its exploration efforts have been waylaid by a variety of legal, logistical, and environmental problems, including multiple lawsuits,[1] the wreck of one of its drill rigs,[2] and the temporary suspension of drilling activities in the

---

[1] *See, e.g.*, *Resisting Envtl. Destruction on Indigenous Lands, REDOIL, v. EPA*, 716 F.3d 1155 (9th Cir. 2013) (challenging permitting of exploratory drilling in the Beaufort and Chukchi Seas); *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1128 (9th Cir. 2012) (challenging the approval of exploration plans in the Beaufort Sea); *Inupiat Comm. of the Arctic Slope v. Salazar*, 486 F. App'x 625 (9th Cir. 2012) (mem.) (challenging the approval of exploratory drilling plans in the Chukchi Sea); *Native Vill. of Point Hope v. Salazar*, 378 F. App'x 747 (9th Cir. 2010) (mem.) (challenging the approval of exploration plans in the Beaufort and Chukchi Seas); *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815 (9th Cir. 2008), *vacated*, 559 F.3d 916 (9th Cir. 2009) (challenging the approval of exploration plans in the Beaufort Sea), *dismissed as moot sub nom.*, *Alaska Wilderness League v. Salazar*, 571 F.3d 859 (9th Cir. 2009); *see also Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) (challenging the authorization of incidental take of polar bears and Pacific walruses related to exploration activity in the Chukchi Sea); *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009) (same, as to the Beaufort Sea).

[2] *See* Gary Braasch, *The Wreck of the Kulluk*, N.Y. TIMES, Dec. 30, 2014, at MM24.

Arctic after the Deepwater Horizon Spill.[3]  We review here another challenge, a claim by a coalition of environmental groups that the Bureau of Safety and Environmental Enforcement ("BSEE") acted unlawfully in approving two of Shell's oil spill response plans ("OSRPs").  The district court granted summary judgment in favor of the federal defendants and intervenor-defendant Shell.  We affirm.

## BACKGROUND

## I.

## The Statutory Schemes

We begin with an overview of the complex statutory backdrop to BSEE's approval of the OSRPs in this case.

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, establishes a four-stage process for the exploration and development of offshore oil and gas resources.  First, the Secretary of the Interior prepares and maintains a five-year oil and gas leasing program.  43 U.S.C. § 1344(a).  Second, the Secretary may grant oil and gas leases for submerged lands in the outer continental shelf at a lease sale, subject to certain terms and provisions.  *See id*. § 1337(a)–(b).  Third, a lessee must "submit an exploration plan to the Secretary for approval," *id.* § 1340(c)(1), accompanied by an Oil Spill Response Plan required under

---

[3] U.S. Dep't of the Interior, Decision Memorandum Regarding the Suspension of Certain Offshore Permitting and Drilling Activities in the Outer Continental Shelf, July 12, 2010, at 1 *available at* http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/ getfile&PageID=38390.

the Clean Water Act, *see* 30 C.F.R. § 550.219 (the approval of which is at issue in this case). In the fourth and final phase, if exploration reveals oil or gas, a lessee must then submit "a development and production plan" for the Secretary's approval. 43 U.S.C. § 1351(a)(1). Each stage triggers certain environmental analysis, and the Bureau of Ocean Energy Management ("BOEM") is responsible for managing the process, including the necessary environmental reviews. *See Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1128 (9th Cir. 2012).

While OCSLA governs the development of oil and gas resources, the Clean Water Act provides a framework for preventing and responding to potential oil spills. *See* 33 U.S.C. § 1321(b). The Clean Water Act mandates oil spill contingency planning at four levels: the national, regional, and area levels, and, lastly, at the level of individual owners and operators of offshore oil facilities. First, at the national level, the President prepares a National Contingency Plan that sets forth "efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges." *Id*. § 1321(d)(2). Second, Regional Response Teams, co-chaired by the Environmental Protection Agency and the Coast Guard, prepare Regional Contingency Plans that coordinate "planning, preparedness, and response activities" across federal agencies, "states, local governments, and private entities." 40 C.F.R. § 300.105(a); *see also id.* at 300.115. Third, Area Committees prepare Area Contingency Plans that, "when implemented in conjunction with the National Contingency Plan, [are] adequate to remove a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge." 33 U.S.C. § 1321(j)(4)(C)(i).

Fourth and finally, and most relevant to this litigation, the President must promulgate regulations that require owners and operators of offshore oil facilities[4] to submit an OSRP "for responding, to the maximum extent practicable, to a worst case discharge . . . of oil or a hazardous substance." *Id.* § 1321(j)(5)(A)(i). The Secretary of the Interior delegated this responsibility to BSEE.[5] 56 Fed. Reg. 54,757, 54,761-62 (Oct. 18, 1991); 76 Fed. Reg. 64,432-01, 64,448 (Oct. 18, 2011). OSRPs must comply with the Clean Water Act's six requirements, listed at 33 U.S.C. § 1321(j)(5)(D), one of which is compliance with the governing Area Contingency Plan. *Id.* § 1321(j)(5)(D)(i); 30 C.F.R. § 550.219. BSEE must "promptly review" submitted plans, "require amendments to any plan that does not meet the requirements of this paragraph," and "*shall* . . . approve any plan that meets" the statutory requirements. *Id.* § 1321(j)(5)(E)(i)–(iii) (emphasis added).

---

[4] While OCSLA refers to "lessees," the Clean Water Act refers to "owners and operators." *Compare* 43 U.S.C. § 1331 et. seq. *with* 33 U.S.C. § 1321. Because this case concerns the approval of OSRPs under the Clean Water Act, we primarily employ the term "operators."

[5] Initially, a single agency, the Minerals Management Service ("MMS"), managed compliance with both OCSLA and the Clean Water Act. *See* 76 Fed.Reg. 64,432, DOI Secretarial Order No. 3229. After the Deepwater Horizon oil spill in 2010, however, the Secretary divided MMS into three new entities. *Native Vill.*, 680 F.3d at 1127 (quoting Press Release, U.S. Dep't of Interior, Salazar Divides MMS's Three Conflicting Missions (May 19, 2010), *available at* http://www.doi.gov/news/pressreleases/Salazar-Divides-MMSs-Three-Conflicting-Missions.cfm). BOEM now manages the development of offshore resources under OCSLA, and BSEE is responsible for the "enforcement of safety and environmental functions" under the Clean Water Act, including approval of the OSRPs at issue here. *Id.* at 1128.

Environmental consultation occurs at several points throughout both OCSLA and the Clean Water Act's four-tiered processes. National Environmental Policy Act ("NEPA") and Endangered Species Act ("ESA") consultations occur when oil and gas exploration leases are first issued (at OCSLA's second stage), 43 U.S.C. § 1344(a)(1) & (b)(3); *see also Sec'y of the Interior v. California*, 464 U.S. 312, 338 (1984), and again when lessee exploration plans are submitted (at OCSLA's third stage), 43 U.S.C. § 1340(c). Additional environmental review takes place upon submission of lessee development and production plans (OCSLA's fourth stage), including another round of NEPA review, *see id.* § 1351(c), and the submission of environmental impact statements ("EIS") to the governors of any affected states, *id.* § 1351(f)–(g). The Secretary may "approve, disapprove, or require modifications" of development plans, and must reject any plan that would "probably cause serious harm or damage to . . . the marine, coastal, or human environments," when weighed against the extent of the threat and the potential advantages of allowing production. *Id.* § 1351(h)(1).

Likewise, the Clean Water Act has several types of environmental review built in throughout its various stages. At the Area Contingency Plan level, Area Committees must consult with both the U.S. Fish and Wildlife Service and the National Oceanic and Atmospheric Administration to prepare "a detailed annex containing a Fish and Wildlife and Sensitive Environments Plan" that "provide[s] the necessary information and procedures to immediately and effectively respond to discharges that may adversely affect" the environment. 40 C.F.R. § 300.210(c)(4)(I). An operator's OSRP must be consistent with the protocols established at this stage. *See* 33 U.S.C. § 1321(j)(5)(D)(i). The National

Contingency Plan also lays out procedures for emergency consultation in the case of an actual oil spill.  *See* 40 C.F.R. § 300.305(e).

## II.

## The Current Dispute

The case before us arises in the context of these overlapping statutory schemes, and represents "the latest chapter in a long-running saga beginning back in April 2002, when the Minerals Management Service ("MMS") established a five-year lease sale schedule for the outer continental shelf of Alaska." *Native Vill*., 680 F.3d at 1126. After Shell acquired offshore oil leases in the Beaufort Sea in 2005 and 2007, and in the Chukchi Sea in 2008, it submitted exploration plans, and the required OSRPs, for activities that were scheduled to commence in the summer of 2010.  MMS, which was then in charge of approving exploration plans and OSRPs, *id.* at 1127, approved Shell's Beaufort Sea OSRP in March of that year and approved Shell's Chukchi Sea OSRP the following month.

The April 2010 Deepwater Horizon oil spill in the Gulf of Mexico shifted the landscape in a number of ways.  BOEM assumed control over the approval of exploration plans, and BSEE assumed responsibility for approving OSRPs.  *Id*. at 1128.  Also, following a moratorium on all oil and gas drilling, the Department of the Interior issued new guidance regarding the content and analysis that should be provided in OSRPs. *See, e.g.*, U.S. Department of the Interior, Bureau of Ocean Energy Management, Regulation, and Enforcement, *Information Requirements for Exploration Plans, Development and Production Plans, and Development*

*Operations Coordination Documents on the OCS* 3 (2010), *available at* http://www.boem.gov/Regulations/Notices-To-Lessees/2010/10-n06.aspx.**[6]**  In response, Shell updated its OSRPs for the Chukchi and Beaufort Seas in May 2011, and again in early 2012.  BSEE approved the two OSRPs in February and March of 2012, respectively.

Following these approvals, Plaintiffs sued the Secretary of the Interior and the Department of the Interior under the Administrative Procedure Act, challenging BSEE's approval of the OSRPs.  Shell successfully intervened.  The parties filed cross-motions for summary judgment.  The district court, following extensive briefing and argument, granted summary judgment in favor of the federal defendants and Shell.  *Shell Gulf of Mex. v. Ctr. for Bio. Diversity, Inc.*, No. 3:12-CV-00048-RRB (D. Alaska Aug. 5, 2013).  This appeal followed.

**STANDARDS OF REVIEW**

"We review the grant of summary judgment de novo, thus reviewing directly the agency's action under the Administrative Procedure Act's ("APA") arbitrary and capricious standard."  *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1144 (9th Cir. 2013), *as amended* (July 9, 2013) (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004)) (internal

---

**[6]** These revised guidelines were then superceded in January 2015.  U.S. Department of the Interior, Bureau of Ocean Energy Management, *Information Requirements for Exploration Plans, Development and Production Plans, and Development Operations Coordination Documents on the OCS for Worst Case Discharge and Blowout Scenarios* (2015), *available at* http://www.boem.gov/NTL-2015-N01/.

quotation marks omitted). Review under this standard "is narrow, and [we do] not substitute [our] judgment for that of the agency." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)) (alterations in original) (internal quotation marks omitted). Rather, reversal is only proper

> if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Lands Council*, 537 F.3d at 987) (internal quotation marks omitted).

Additionally, under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), we engage in a three-step inquiry when reviewing an agency's interpretation of a statute that it is entrusted to administer. First, we must decide whether Congress intended "the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Next, we ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. Finally, if the statute is silent or ambiguous as to the issue at hand, we then defer to the

agency's reading so long as its interpretation is a reasonable one. *Id.* at 843.

## DISCUSSION

## I.

## The Administrative Procedures Act

Plaintiffs argue that BSEE's approval of the OSRPs was arbitrary and capricious in violation of the Administrative Procedures Act. *See* 5 U.S.C. § 706(2)(A). According to Plaintiffs, Shell assumed that, in the event of a worst case discharge, Shell would achieve a mechanical recovery of 90 to 95 percent of any oil spilled in the Arctic Ocean—an assumption that Plaintiffs characterize as unrealistic and unsupported. Plaintiffs, however, have misread the record, which shows that Shell never assumed a 90 to 95 percent mechanical recovery rate. And even assuming that it did, BSEE did not rely on any such assumption in approving Shell's OSRPs.

The pertinent portion of Shell's OSRPs reads as follows:

> To scale the potential shoreline response assets needed, and for planning purposes, Shell based these assets upon the assumption that 10 percent of the 25,000-[barrels of oil per day ("bopd")] discharge escapes the primary offshore recovery efforts at the blowout. This unrecovered 2,500 bopd is assumed to drift toward the mainland . . . . It is assumed that half of the oil reaching the nearshore environment is recovered by the

skimming systems dispatched from [a large, mobile oil spill response barge and tug]. The remaining 1,250 bopd are assumed to migrate toward the shoreline where [Shell's spill response contractor] would mobilize personnel and equipment to intercept the oil and deploy boom for shoreline protection.[7]

Thus, on a straightforward reading of the OSRPs, Shell made two assumptions—that 10 percent of spilled oil would "drive toward the mainland," half of which would be recovered by skimming systems and half of which would "migrate toward the shoreline"—for purposes of "scal[ing] the potential shoreline response assets needed." Nothing in the OSRPs' text suggests that Shell was predicting a 90 to 95 percent mechanical recovery rate. Indeed, Shell's OSRPs make clear that it was estimating the potential shoreline response assets needed in order to comply with an Alaska state law requiring certain calculations regarding the magnitude of a worst case scenario oil spill. BSEE's regulations identify the specific information an operator must provide when discussing its worst case discharge scenario, and these regulations do not require an estimated recovery rate for spilled oil. *See* 30 C.F.R. § 254.26(a)–(d). In short, the record simply does not support Plaintiffs' claim that Shell assumed an impossibly high recovery rate of almost 100 percent.

Moreover, it is equally clear from the administrative record that BSEE did not rely on a purported 90 to 95 percent

---

[7] This quote is taken from Shell's Chukchi Sea OSRP. Pls.' Excerpts of R. at 959, ECF No. 24-10. An analogous claim was made in Shell's Beaufort Sea OSRP. *See* Pls.' Excerpts of R. at 907, ECF No. 24-10.

mechanical recovery rate in approving Shell's OSRPs. While Shell's OSRPs were under consideration, the National Oceanic Atmospheric Administration expressed concern that "Shell was claiming it would mechanically recovery 95 percent of oil spilled in any incident, which is many times more than the best performance currently achievable." Pls.' Excerpts of R. at 286, ECF No. 24-3. BSEE responded that "this was a misreading of the plan, which is not a performance standard. Shell is claiming to have the capacity to store up to 95 percent of the [worst case discharge] volume, not that it would be able to actually collect that much." *Id.* This record shows that BSEE internally acknowledged some "confusion" over the "planning v. performance issue" in the OSRPs, but nonetheless reaffirmed its view that Shell was "in no way claiming an ability to recover 90 percent of the oil." *Id.* at 288. Thus, Plaintiffs' claim that BSEE's approval of the OSRPs was arbitrary and capricious on the ground that Shell assumed an impossibly high recovery rate fails.

## II.

### The Endangered Species Act

Next, Plaintiffs argue that BSEE should have engaged in ESA consultation before approving the OSRPs. Section 7 of ESA requires federal agencies to consult with the appropriate environmental agencies before taking an action that may affect endangered species or habitats. 16 U.S.C. § 1536(a)(4); *see also Nat'l Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014). Even if there is agency "action," however, ESA consultation is triggered only if "there is *discretionary* Federal involvement or control," 50 C.F.R. § 402.03 (emphasis added), because consultation

would be merely a "meaningless exercise" if the agency lacks the power to implement changes that would benefit endangered species, *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995).[8]

Here, we need not decide whether BSEE's approval of the OSRPs constitutes agency action.  Even assuming, without deciding, that the approval of the OSRPs was agency action, we conclude that it was a nondiscretionary action and thus ESA's consultation requirement was not triggered.  Because Congress has "delegat[ed] administrative authority" to the agency to interpret this statute, *Chevron*'s framework applies. *See Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority.").  As discussed below, at *Chevron* Step One, we find the relevant provisions of the Clean Water Act ambiguous, and therefore "Congress has [not] directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  At *Chevron* Step Two, we find the agency interpretation reasonable, and therefore we must accord its interpretation deference. *See id.* at 843.

## A. *Chevron* Step 1: The Statute's Ambiguity

The Clean Water Act, as amended by the Oil Pollution Act of 1990, offers three pertinent instructions regarding the content and approval of operators' OSRPs.   First, at

---

[8] Because we determine that discretionary agency action did not occur, we need not decide whether the action "may affect a listed species or designated critical habitat."  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (quoting *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003) (internal quotation marks omitted)).

33 U.S.C. § 1321(j)(5)(A)(i), the statute states that "[t]he President shall issue regulations which require an . . . operator . . . to prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." Second, at § 1321(j)(5)(D), the statute lists six requirements that OSRPs "shall" meet. Specifically, OSRPs must

>(i) be consistent with the requirements of the National Contingency Plan and Area Contingency Plans;

>(ii) identify the qualified individual having full authority to implement removal actions, and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment pursuant to clause (iii);

>(iii) identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge;

>(iv) describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at

the facility, to be carried out under the plan to ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge;

(v) be updated periodically; and

(vi) be resubmitted for approval of each significant change.

*Id*.   The statute then *mandates* approval if the above requirements are met, stating that "the President shall . . . approve any plan that meets the requirements of this paragraph." *Id.* § 1321(j)(5)(E)(iii).  All three instructions— the "maximum extent practicable" language, the six enumerated statutory criteria, and the President's "shall approve" requirement—fall within the same statutory section (specifically, paragraph (5)).  Pursuant to the Clean Water Act's directive, the agency has issued regulations that set forth what an operator must do to meet the criteria set out in this section.  30 C.F.R. pt. 254.

We find the statute ambiguous in two ways—in the statutory language itself, and in the statute's structure.  The text does not explicitly grant or deny BSEE discretion to consider additional environmental factors in the OSRP approval process.  Section 1321(j)(5)(A)(i), which directs the agency to issue regulations requiring operators "to prepare and submit . . . a plan for responding, to the maximum extent practicable, to a worst case discharge," suggests agency discretion because of the open-ended nature of the phrase "maximum extent practicable."   On the other hand, § 1321(j)(5)(D) reads like a checklist statute, and BSEE *must* approve "any plan that meets the requirements of this

paragraph," 33 U.S.C. § 1321(j)(5)(E)(iii). Thus, these sections suggest no agency discretion.

The statute's structure adds to the ambiguity. These two directives are listed in two separate portions of the paragraph that delineates an OSRP's requirements. It is unclear how the broad language of section 1321(j)(5)(A)(i), with its reference to the "maximum extent practicable," interacts with the finite statutory criteria of section 1321(j)(5)(D). "And that means we . . . face a statute whose halves do not correspond to each other– giving rise to an ambiguity that calls for *Chevron* deference." *Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2210 (2014) (plurality opinion). We must defer to the agency's interpretation of the statute unless it is unreasonable. *Chevron*, 467 U.S. at 843.

**B.  *Chevron* Step 2: The Reasonableness of the Agency's Interpretation**

Reaching *Chevron*'s second step, we must determine if the agency's interpretation of the ambiguous governing statute is a reasonable one. When "the agency's answer is based on a permissible construction of the statute," we must defer to the agency's view and not "impose [our] own construction on the statute." *Chevron*, 467 U.S. at 843; *see also Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 981 (1986) (noting that the court is "preclude[d] . . . from substituting its judgment for that of the [agency]" when the agency's interpretation of a statute it administers is "sufficiently rational").

BSEE argues that the purpose of an OSRP is to ensure that private operators have response capacity consistent with federal contingency plans in the event of a worst case

discharge.  Thus, Congress has limited its discretion to reviewing an OSRP to determine if it meets the six enumerated requirements of section 1321(j)(5)(D) and the agency's coterminous implementing regulations.  BSEE reads its regulations as providing further refinement of the statutory criteria and the framework under which compliance with the criteria will be assessed.  Since the statute mandates that the President (and now, BSEE by delegation) "shall . . . approve any plan that meets the requirements of this paragraph," 33 U.S.C. § 1321(j)(5)(E), BSEE contends that it lacks discretion to consider factors apart from these delineated statutory criteria.

We conclude that BSEE's interpretation of the statute is reasonable, and thus we must defer to the agency.  Significantly, the sections on which the agency relies, § 1321(j)(5)(D)–(E), speak directly to what a plan *shall* contain and what the agency *shall* approve.    Section 1321(j)(5)(A)(i), in contrast, is more circuitous, discussing what the President's *implementing regulations* should require. *See id.* ("The President shall issue regulations which require an owner or operator . . . to prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge . . . .").  In other words, the agency reads § 1321(j)(5)(A)(i) as an instruction to issue regulations that delineate how operators can comply with the statutory checklist enumerated at § 1321(j)(5)(D).  Thus, the agency reasonably understands its discretion to be constrained by § 1321(j)(5)(D)'s list of requirements which, upon their satisfaction, trigger mandatory agency approval of the OSRP.

Our deference to the agency's reading is similar to that provided by the Supreme Court in *Young v. Community*

*Nutrition Institute*, 467 U.S. 974 (1986).   In *Young*, the Supreme Court considered a statute which required the Food and Drug Administration ("FDA") to "promulgate regulations limiting the quantity [of poisonous or deleterious substances that cannot be avoided within foods] therein or thereon to such an extent as [the agency] finds necessary."  476 U.S. at 977 (quoting 21 U.S.C. § 346).  The FDA interpreted this provision to "give it the discretion to decide *whether* to promulgate" a quantity limit, while the plaintiffs interpreted the statute to require the agency to set a limit whenever a poisonous substance was present.   *Id.* at 977 (emphasis added), 980.  Applying the *Chevron* framework, the Court first found the statutory language to be ambiguous as to the question of the agency's discretion and then deferred to the FDA's interpretation, finding it "to be sufficiently rational to preclude a court from substituting its judgment for that of the [agency]."  *Id.* at 980–81.  No regulation explicitly reflected the agency's view of its discretion, but its position was consistent with the statutory scheme and longstanding agency policy.  *Id.* at 977, 981–84.

Just like in *Young*, BSEE's position is consistent with the statute's scheme and the agency's longstanding policy.  The applicable regulations "provide specific instructions to operators as to what they must do to meet [the] Clean Water Act requirements," which then trigger the agency's mandatory approval under § 1321(j)(5)(E)(iii).  *E.g.*, *compare* 30 C.F.R. § 254.5(b) (requiring the OSRP to "be consistent with the National Contingency Plan and the appropriate Area Contingency Plan(s)") *with* 33 U.S.C. § 1321(j)(5)(D)(i) (imposing the same requirement); *compare* 30 C.F.R. § 254.23(g) (requiring information about procedures the operator "will follow in the event of a spill") *with* 33 U.S.C. § 1321(j)(5)(D)(iii) (requiring the OSRP to "identify, and

ensure by contract or other means . . . the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge"). Further, BSEE's interpretation is consistent with the Department's longstanding position on the interaction of its regulations with the statute.  When promulgating its 1997 final rule, MMS understood its regulatory requirements to be coextensive with the statutory requirements, stating in the rule's preamble that "[t]he rule will bring MMS regulations into conformance with the Oil Pollution Act of 1990." Response Plans for Facilities Located Seaward of the Coast Line, 62 Fed. Reg. 13991, 13991 (Mar. 25, 1997).  Moreover, the Department has expressly confirmed this understanding in its briefing on appeal.  The fact that "the Secretary's interpretation comes to us in the form of a legal brief . . . does not, in the circumstances of this case, make it unworthy of deference," so long as it "reflect[s] the agency's fair and considered judgment on the matter in question."  *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

The legislative history of the Oil Pollution Act's passage lends further support to BSEE's interpretation.  *See Natural Res. Def. Council v. Envtl. Prot. Agency*, 526 F.3d 591, 603 (9th Cir. 2008) (providing that we may look to legislative history to assist our interpretation of an ambiguous statute under *Chevron*).  In its comments on the Senate version of the Oil Pollution Act of 1990, much of whose language was incorporated into the House Bill that ultimately passed and amended the Clean Water Act, the Committee on Commerce, Science, and Transportation noted that the bill imposed "[s]pecific requirements for the [oil spill contingency] plans." S. Rep. 101-99, at 4 (1989), *reprinted in* 1990 U.S.C.C.A.N. 749, 752.  This suggests that Congress likely meant to impose specific obligations upon operators in their oil spill response

preparations, and not create an amorphous standard for the Executive Branch to interpret and enforce.  *See also* 136 Cong. Rec. S11931-01 (Aug. 2, 1990) (statement of Sen. Warner) (noting that "[t]he bill imposes rigorous new contingency planning requirements on areas and vessels," while obliging "the President to take charge of all major oilspills and to determine when cleanup is complete").

The dissent focuses on the breadth of § 1321(j)(5)(A)(i)'s "maximum extent practicable" language and emphasizes that because this language reads like a broad mandate, the evaluation of which would require significant agency discretion, BSEE must engage in ESA consultation before approving an OSRP.  Under the dissent's view, § 1321(j)(5)(A)(i)'s "maximum extent practicable" language serves as an independent "standard" that must be met in addition to the list of enumerated requirements at § 1321(j)(5)(D).  The dissent's reading of the statute, however, gives short shrift to the ambiguity in the statute's text and structure.

Of course, we agree that § 1321(j)(5)(A)(i)'s "maximum extent practicable" language is broad, and the statute arguably could be read to support the dissent's interpretation.  But we must accord *Chevron* deference to the agency's alternative understanding.  While focusing on § 1321(j)(5)(A)(i), the dissent largely overlooks the presence of § 1321(j)(5)(D), which lays out a list of specific requirements that OSRPs must meet.  BSEE reads this subsection, and the mandatory agency approval required once the specific requirements are met, *see* § 1321(j)(5)(E), to eliminate its discretion.  This interpretation is assuredly a "permissible construction" of the ambiguous statutory language and structure.  *Chevron*, 467 U.S. at 843.  And it is not our role to displace the

agency's reasonable construction of a statute that it is responsible for administering. *See Mead*, 533 U.S. at 229 ("[A] reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise.").

The dissent resists the *Chevron* deference that we must give to the agency's interpretation by finding the implementing regulations to be an unreasonable interpretation of the statute. The regulations define "maximum extent practicable" to mean "within the limitations of available technology, as well as the physical limitations of personnel." 30 C.F.R. § 254.6. The dissent argues that this definition is incomplete because it fails to account for the superlative nature of the word "maximum" and instead provides a definition only of what is "practicable." Since the definition is incomplete, the dissent reasons, it is therefore unreasonable, obviating the need for this court to apply *Chevron*'s framework.

Tellingly, even Plaintiffs do not rely on the purported vagueness of the agency's implementing regulations. To the contrary, Plaintiffs' counsel *conceded* the adequacy of the regulatory definition at oral argument, stating that "[t]he regulations clearly define maximum extent practicable" and that "the regulations are fully consistent with" the maximum extent practicable standard. Oral Argument at 7:55, 8:44, *available at* http://www.ca9.uscourts.gov/media/view_ video.php?pk_vid=0000006548. We also do not find the regulatory definition to be problematic. "In the absence of . . . a definition, we construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). A natural reading of the regulation

indicates that operators must be prepared to respond to an oil spill to the highest degree possible (to the "maximum"), not exceeding "the limitations of available technology . . . [and] the physical limitations of personnel."  30 C.F.R. § 254.6. While the agency could have been more explicit by specifying that "maximum extent practicable" means the *highest degree* of response possible "within the limitations of available technology," *id.*, such a clarification would be superfluous since the plain meaning of "maximum" leads to the same reading.  Therefore, we cannot say that the agency regulation constitutes an "[im]permissible construction of the statute." *Chevron*, 467 U.S. at 843.

More importantly, this regulatory definition is largely peripheral to our analysis.  We defer to the agency's interpretation here not because of its regulatory promulgation, but because we face a "statutory inconsistency . . . giving rise to an ambiguity that calls for *Chevron* deference." *Cuellar de Osorio*, 134 S. Ct. at 2210 (plurality opinion).  The text and structure of the statute are unclear as to whether the statute grants the agency discretion to use a broad, indeterminate standard to review OSRPs, or whether it mandates approval of plans that meet the requirements of § 1321(j)(5)(D). "Confronted with a self-contradictory, ambiguous provision in a complex statutory scheme, the [agency] chose a textually reasonable construction consonant with its view of the purpose and policies underlying . . . [the] law." *Id*. at 2213. We do not "assume as our own the responsible and expert agency's role," and instead defer to BSEE's reasonable interpretation of the gap in a statute it has been tasked with interpreting. *Id*.

We address a number of additional arguments raised by Plaintiffs.  They note that the statutory sections governing the

federal government's spill plans, at §§ 1321(d)(1)–(2), (j)(4)(B)–(D), contain the same "shall approve" formulations, and yet are admittedly subject to ESA's consultation requirements. These provisions, however, are different. Section 1321(d)(1) states that the President "shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances pursuant to this section." Nothing in the text prohibits such a plan from being prepared in light of concerns that an ESA consultation might raise. Similarly, § 1321(d)(2) specifies that the National Contingency Plan "shall provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges," and "shall include, but not be limited to" a list of enumerated factors. This suggests that a National Contingency Plan could (and should) contain *additional* factors that might be deemed necessary after an ESA consultation occurs. Likewise, while the President shall "review and approve Area Contingency Plans," this language does not suggest that *any* plan meeting a list of set requirements must be approved. *Compare id.* § 1321(j)(4)(B)–(D) *with id.* § 1321(j)(5)(D)–(E).

Section 1321(j)(5)(E)'s language, in contrast, requires that the President "shall . . . approve any plan that meets the requirements of this paragraph." This language leaves no room for the inclusion of additional factors. The absence of agency discretion is apparent not from the words "shall approve" alone, but from the phrase "shall . . . approve *any plan that meets the requirements of this paragraph*." *Id.* § 1321(j)(5)(E) (emphasis added).

Plaintiffs next argue that "[t]he regulations never say that so long as a plan addresses in some fashion various questions, the agency must conclude the plan meets the statutory

mandates." Pls.' Opening Br. at 46. Yet, 30 C.F.R. § 254.9(b) explicitly states that the information in the OSRP is collected to "ensure that the owner or operator . . . is prepared to respond to an oil spill" and to "verify compliance with the mandates" of the Oil Pollution Act's amendments to the Clean Water Act. In any event, such an explicit pronouncement is not a prerequisite for *Chevron* deference to apply. *See, e.g.*, *Young*, 476 U.S. at 981–82 (deferring to the FDA's interpretation of an ambiguous statutory provision even in the absence of a regulation explicitly stating the agency's position); *Fernandez v. Brock*, 840 F.2d 622, 633 (9th Cir. 1988) (deferring to the Secretary of Labor's interpretation of statute that was ambiguous as to the presence of agency discretion).

Finally, plaintiffs argue that ESA's consultation requirement is triggered because BSEE exercises discretion in deciding *whether* the six statutory criteria are met. This position, however, is irreconcilable with the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 671 (2007), which held that ESA cannot defeat an agency's nondiscretionary statutory directive. The statute at issue there listed nine statutory criteria; if those criteria were satisfied, the agency bore a nondiscretionary duty to perform a specific action (namely, transfer certain permitting powers to state authorities). *Id.* at 661. *Home Builders*'s analysis is directly applicable here.[9] BSEE may only determine whether the

---

[9] The dissent points out that *Home Builders* relied in part on the fact that ESA was passed after the statute requiring the transfer of permitting power, while the provisions of the Clean Water Act at issue here were enacted in 1990, post-dating ESA's 1972 passage. *See Home Builders*, 551 U.S. at 662–64. This factual distinction in timing does not change the

statutory criteria in 33 U.S.C. § 1321(j)(5)(D) have been met, and if they have been met, BSEE must approve the plan. Since determining *whether* the statutory criteria have been achieved does not trigger ESA's consultation requirement, Plaintiffs' argument must again fail.

In sum, deferring to the agency's interpretation of the statute that it has been entrusted to administer, and its own regulations, we hold that BSEE's approval of the OSRPs was a nondiscretionary act that did not trigger a requirement for inter-agency consultation under the ESA.

## III.

## The National Environmental Policy Act

Finally, Plaintiffs argue, and the dissent agrees, that BSEE violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") before approving the OSRPs. NEPA requires federal agencies to provide an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). NEPA's implementing regulations define "[m]ajor Federal action" to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  Even when a major federal action occurs, however, NEPA remains subject to a "rule of reason" that frees agencies from preparing a full EIS

---

outcome of our analysis.  *See, e.g.*, *Grand Canyon Trust v. United States Bureau of Reclamation*, 691 F.3d 1008, 1020 (9th Cir. 2012) (relying on *Home Builders* to hold that agency action required in part by a 1992 statute did not require ESA consultation).

on "the environmental impact of an action it could not refuse to perform." *Pub. Citizen*, 541 U.S. at 769. Thus, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions," the agency "[does] not need to consider the environmental effects arising from" those actions. *Id.* at 770; *see also Sierra Club*, 65 F.3d at 1513 ("The [Bureau of Land Management's] inability meaningfully to influence Seneca's right-of-way construction leads us to conclude that the procedural requirements of NEPA do not apply to this case.").

Here, as our ESA analysis suggests, BSEE reasonably concluded that it must approve any OSRP that meets the statutory requirements. *See* 33 U.S.C. § 1321(j)(5)(D)–(E). Thus, even assuming, without deciding, that BSEE's approval of Shell's OSRPs constitutes a "major Federal action," its approval is not subject to NEPA's requirements.

The dissent accepts Plaintiffs' argument that no authority prevents BSEE from requiring Shell to make changes to the OSRPs in order to minimize adverse environmental effects. On the contrary, BSEE's authority is just so constrained. The governing statute mandates that the agency "shall . . . approve any plan that meets the requirements" of the statutory section. *Id.* § 1321(j)(5)(E). This language is similar to the statutory mandate at issue in *Public Citizen*, where the governing statute required that the Federal Motor Carrier Safety Administration ("FMCSA") "*shall* register a person to provide transportation . . . as a motor carrier if [it] finds that the person is willing and able to comply with" that statute's requirements. *Pub. Citizen*, 541 U.S. at 766 (alterations in original) (quoting 49 U.S.C. § 13902(a)(1)). Examining this statutory mandate, the Supreme Court found that FMCSA registration of cross-border motor carriers did not trigger

NEPA review because "FMCSA [had] no ability categorically to prevent the cross-border operations of . . . motor carriers, [and thus] the environmental impact of the cross-border operations would have no effect on FMCSA's decisionmaking." *Id.* at 768. NEPA review was not required because the FMCSA lacked the power to consider environmental consequences outside of its statutory obligation. *See id.* at 768–70.

The statute here similarly restricts BSEE's discretion. BSEE is required to approve an OSRP that meets the statute's requirements, which the agency reasonably interprets to be the checklist of six requirements set forth in § 1321(j)(5)(D). Applying NEPA to this process, then, would merely "require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform," which would clearly violate NEPA's "rule of reason." *Pub. Citizen*, 541 U.S. at 769.

This does not mean that NEPA review is entirely absent. Indeed, the NEPA environmental assessment that is required to be conducted as to Shell's exploration plan expressly considered the environmental effects of Shell's OSRPs. As mentioned *supra*, an operator's OSRP, which is the fourth step of the Clean Water Act's oil spill response framework, must be submitted in conjunction with a lessee's exploration plan, which is OCSLA's third step. 30 C.F.R. § 550.219. In a memorandum dated February 17, 2012, BSEE clarified that the Chukchi OSRP was considered in the development of an environmental assessment of Shell's Revised Exploration Plan for the Chukchi Sea. Similarly, Shell's Beaufort Sea OSRP was considered in the exploration plan Shell submitted regarding its Flaxman Island Leases. Thus, both of the OSRPs at issue here underwent NEPA review at OCSLA's

third step—which is consistent with the requirement that OSRPs be submitted at this stage. *See id.* In sum, we conclude BSEE is not required to prepare an EIS prior to approving the OSRPs.

## CONCLUSION

BSEE's approval of Shell's OSRPs was not "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In its OSRPs, Shell never asserted, nor did BSEE ever rely on, a 90 to 95 percent mechanical recovery rate for spilled oil. According deference, as we must, to BSEE's interpretation of the statute and its own regulations, BSEE lacked discretion to deny approval once it determined that the OSRPs satisfied the statutory requirements. Therefore, ESA consultation and NEPA review were not required.

**AFFIRMED.**

D.W. NELSON, Senior Circuit Judge, dissenting:

I agree with the majority that the Bureau of Safety and Environmental Enforcement (the Bureau) did not act in an arbitrary or capricious manner in approving the oil response plans, and I concur in the majority opinion as to that issue. I respectfully dissent, however, from the remainder of the majority opinion.

In my view, the Bureau was required to engage in consultation pursuant to the Endangered Species Act (ESA) before approving Shell's oil response plans. Moreover, the

Bureau should have conducted analysis pursuant to the National Environmental Policy Act (NEPA) before approving the oil response plans. Thus, I would reverse the grant of summary judgment as to ESA consultation and compliance with NEPA.

## 1.  ESA Consultation

The majority holds that the Bureau's approval of an oil response plan is a nondiscretionary action, and, thus, the Bureau had no obligation to consult pursuant to the ESA. I disagree.

### a.  Agency Action

The first question is whether the Bureau engaged in agency action. It did. The duty to consult exists only where "agency action" is present. *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998). Agency action includes "federal agencies' authorization of private activities," such as the Bureau's approval of the oil response plans here. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012); 33 U.S.C. § 1321(j)(5)(F).

Of course, not all agency actions necessitate consultation. Indeed, only those actions that "may affect" a protected species trigger the requirement, 50 C.F.R. § 402.14(a), though the "may affect" requirement is an admittedly low threshold, *Karuk Tribe*, 681 F.3d at 1027. Here, the approval of the oil response plans satisfies the "may affect" standard. In the event of an oil spill, Shell would have to carry out its oil response plan, which governs the protection of wildlife. 30 C.F.R. § 254.5(a). Thus, the Bureau's decision to approve the

oil response plans, or to require amendments to those plans, "may affect" a protected species.

### b.  Agency Discretion

Next, we must consider whether the Bureau had discretion to approve the oil response plans.  It did.  "The ESA's consultation duty is triggered . . . only when the agency has authority to take action and discretion to decide what action to take.  There is no point in consulting if the agency has no choices."  *Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 842 (9th Cir. 2013).  What is more, "the discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species."  *Karuk Tribe*, 681 F.3d at 1024.

"Whether an agency must consult does not turn on the *degree* of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat."  *Natural Res. Defense Council v. Jewell*, 749 F.3d 776, 784 (9th Cir. 2014) (en banc).  In other words, if the agency could take action that benefits protected species, the agency must conduct ESA consultation.  *See id.*; *see also Karuk Tribe*, 681 F.3d at 1024 ("[T]o avoid the consultation obligation, an agency's competing statutory mandate must require that it perform specific nondiscretionary acts rather than achieve broad goals.").  Ultimately, "[t]he relevant question is whether the agency *could* influence a private activity to benefit a listed species, not whether it *must* do so." *Karuk Tribe*, 681 F.3d at 1025.

In my view, the Bureau's decision to approve or reject an oil spill response plan is precisely the kind of discretionary

act that triggers ESA consultation.  The Oil Pollution Act requires private owners or operators of vessels and facilities, such as Shell, to prepare an oil spill response plan. 33 U.S.C. § 1321(j).  This response plan must explain how an operator like Shell will respond "to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5)(A)(i).      The phrase "maximum extent practicable" suggests that Congress intended entities like Shell to create plans that have the capacity to respond to an oil spill to the greatest possible degree, given logistical constraints.  *See* 30 C.F.R. § 254.6 (defining "maximum extent practicable" as "within the limitations of available technology, as well as the physical limitations of personnel").  At the same time, this broad, subjective standard does not direct the Bureau to act in a specific or clearly defined way, but, rather, contemplates that the Bureau will exercise its judgment when determining whether an oil response plan satisfies the "maximum extent practicable" requirement. *See Karuk Tribe*, 681 F.3d at 1024–25.

The implementing regulations bolster my view, as they make clear that the Bureau can exercise its discretion to benefit a protected species.  For instance, the regulations require both an owner or operator to identify resources of "environmental importance" that could be harmed by a "worst case discharge scenario" and to provide strategies that will be used to protect those resources.  30 C.F.R. §§ 254.26(a), (c).  In addition, the regulations also call for an owner or operator to explain how, in the event of an oil spill, it will "protect beaches, waterfowl, other marine and shoreline resources, and areas of special . . . environmental importance." 30 C.F.R. § 254.23(g)(4). Furthermore, Shell's response plans themselves underscore the importance of

protecting wildlife. Each plan devotes an entire appendix to discussing wildlife protection tactics and includes measures to protect wildlife.

Shell and the government would have us hold that the Bureau lacked discretion here because the Oil Pollution Act states that the Bureau "shall approve" any oil response plan that meets the statutory criteria. 33 U.S.C. § 1321. This compulsory language, the argument goes, reflects the absence of Bureau discretion. I disagree. The Bureau cannot avoid consultation here because it is not obligated to "perform specific nondiscretionary acts." *Karuk Tribe*, 681 F.3d at 1024. Neither the Oil Pollution Act nor its implementing regulations sets forth a rigid, mechanical set of requirements that specify when the Bureau must approve an oil response plan. There is no checklist to be ticked off; approval is not rote. Rather, the Bureau must consider a wide range of environmental, ecological and other factors in deciding whether an oil response plan meets the "maximum extent practicable" standard.

Shell and the government note that the Bureau interprets the implementing regulations as coextensive with the "maximum extent practicable" standard. Thus, they contend, and the majority agrees, both that the regulations do not give the Bureau any discretion and that we should accord *Chevron* deference to the Bureau's interpretation of the Oil Pollution Act. Yet again, I disagree.

Our analysis pursuant to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), involves two questions. First, we ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If so, the court "must give effect to the unambiguously expressed intent

of Congress." *Id.* at 842–43. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Here, I do not believe the implementing regulations contain a reasonable definition of "maximum extent practicable." The regulations reference the phrase only once. They provide: "Maximum extent practicable means within the limitations of available technology, as well as the physical limitations of personnel, when responding to a worst case discharge in adverse weather conditions." 30 C.F.R. § 254.6. If this occupies the full and complete definition of "maximum extent practicable," it is unreasonable and not entitled to deference. The word "maximum," a superlative, means "the highest possible magnitude or quantity of something," or "highest, greatest." *Maximum*, Oxford English Dictionary, http://www/oed.com/view/Entry/115275?redirectedFrom= maximum#eid (last visited April 27, 2015). Thus, the phrase "maximum extent practicable" also has a superlative quality and therefore must refer to the greatest option in a range of possibilities. But the Bureau's definition is not a superlative, as it refers to a range of possibilities, taking into account practical limits. Thus, it gives effect only to the term "practicable" while ignoring the term "maximum." We should not defer to this nonsensical and incomplete definition. *Coronado-Durazo v. I.N.S.*, 123 F.3d 1322, 1324 (9th Cir. 1997) ("We are not obligated to accept an interpretation that is demonstrably irrational or clearly contrary to the plain and sensible meaning of the statute." (internal quotation marks and citation omitted)). The regulations merely clarify that owners and operators, such as Shell, will not be held to an impossibly high standard that

exceeds current technological capabilities and other logistical constraints.

The majority relies on the *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), to hold that the Bureau has no discretion to determine whether Shell complied with the six statutory factors enumerated in the Oil Pollution Act.  I find this argument unpersuasive.  In *Home Builders*, the Supreme Court noted that the Clean Water Act required the Environmental Protection Agency to approve an application to transfer permitting authority to a state, unless that state lacked the authority to perform the nine functions spelled out in the statute.  *Id.* at 661.  The Court described the statutory language as "mandatory" and the list of nine functions as "exclusive," holding that "if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application."  *Id.*  At the same time, however, the ESA required consultation, in addition to the nine enumerated factors.  *Id.* at 662.  Faced with these irreconcilable statutory directives, the Court held that the later-enacted ESA did not amend the Clean Water Act in part because requiring ESA consultation would "engraft[] a tenth criterion onto the [Clean Water Act]."  *Id.* at 663.

This case, however, differs in significant respects from *Home Builders*.  First, the Supreme Court's analysis in *Home Builders* hinged in part on the fact that the ESA came after the Clean Water Act.  *See id.* at 662–64.  Here, however, the Oil Pollution Act of 1990 postdated the ESA.  33 U.S.C. § 2701 et seq. (Oil Pollution Act); 16 U.S.C. § 1531 et seq. (ESA, passed in 1972).  In fact, Congress passed the Oil Pollution Act after ESA consultation already had been required for seventeen years.  Thus, the concern that ESA consultation implicitly amended an exclusive set of statutory

requirements of the Oil Pollution Act by adding a new requirement beyond the original enactment is absent here. Moreover, both parties in *Home Builders* appeared to agree that the state possessed the authority to perform each of the nine enumerated functions but disagreed about whether ESA consultation added an extra step to the process. *See* 551 U.S. at 662. The question here is of a different sort. It is not whether the "maximum extent practicable" standard adds an additional step to the approval process for oil spill response plans but about how to interpret "maximum extent practicable," which is one of many subjective items the Bureau must consider in whether to approve an oil spill response plan.

## 2. NEPA Consultation

The majority holds that because the Bureau had no choice but to approve any oil response plan that met the enumerated requirements in the Oil Pollution Act, the Bureau was exempt from NEPA review. I disagree.

NEPA "declare[s] a national commitment to protecting and promoting environmental quality." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 945 (9th Cir. 2005). NEPA achieves these broad goals by "merely prohibit[ing] uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). Specifically, NEPA requires agencies to prepare a detailed environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS "must inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *League*

*of Wilderness Defenders-Blue Mountains Biodiversity Project
v. U.S. Forest Serv.*, 689 F.3d 1060, 1068–69 (9th Cir. 2012)
(internal quotation marks and citation omitted).

Here, the Bureau did not conduct any NEPA analysis,
which the majority forgives, reasoning that approval of the oil
response plan fell within the "rule of reason." *Dep't of
Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004). In other
words, where an agency is obligated to take specific action,
an analysis of the environmental impact of that action serves
no purpose. *Id.* But this exception does not apply where an
agency has "statutory authority to regulate the environmental
consequences" of a major federal action. *League of
Wilderness Defenders-Blue Mountains Biodiversity Project
v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008).
That is the circumstance here.

The Bureau did in fact possess the kind of discretion that
necessitated NEPA review. The Oil Pollution Act and its
implementing regulations grant the Bureau significant
authority to regulate the activities of owners and operators of
offshore facilities. The regulations demand that the plan
include provisions for protecting wildlife and areas of special
environmental importance. 30 C.F.R. §§ 254.23(g)(3)–(4),
(7). In addition, the Bureau must apply the broad and
amorphous "maximum extent practicable" standard in
considering the validity of an oil response plan. 33 U.S.C.
§§ 1321(j)(5)(A)(i) & (D)(iii). This subjective process gives
the Bureau the authority to require amendments to the plan.
*Id.* at § 1321(j)(5)(E)(ii). Thus, I would hold that because the
Bureau regulates the response activities and prevention
efforts of entities like Shell, and because it retains authority
to ensure that those entities' response efforts will protect the

environment effectively in the event of an oil spoil, it is not exempt from its duty to conduct NEPA review.

Morever, the Oil Pollution Act specifically directs the Bureau to consider environmental factors in its decisionmaking process. Thus, requiring NEPA analysis is squarely in line with "NEPA's core focus on improving agency decisionmaking." *Pub. Citizen*, 541 U.S. at 769 n.2; 40 C.F.R. § 1500.1(c). Because environmental protection lies at the core of the Bureau's duties pursuant to the Oil Pollution Act, NEPA review would not offend the rule of reason.

I also do not think that the Bureau discharged its duty to conduct NEPA review by relying on previous analyses that considered the environmental impact of oil and natural gas exploration in the Arctic. Certainly, an agency may rely on prior analysis to discharge its duties pursuant to NEPA. *See Pub. Citizen*, 541 U.S. at 767; 40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."); 43 C.F.R. § 46.120(b) ("If existing NEPA analyses include data and assumptions appropriate for the analysis at hand, the [agency] should use these existing NEPA analyses and/or their underlying data and assumptions where feasible.").

But an agency cannot discharge its duties pursuant to NEPA solely by relying on prior analyses if those analyses do not fulfill NEPA's purpose of ensuring "that the agency has taken a hard look at the environmental effects of the proposed action." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal quotation marks and citation omitted). Here, the documents on which the Bureau relied did not discuss alternatives to approving Shell's response plans. *N. Idaho Cmty. Action Newtork v. U.S. Dep't*

*of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (noting an EIS requires "rigorous" evaluation of alternatives); 43 C.F.R. §  46.120(c).    The  prior  analyses  do  provide  some consideration of oil spill response techniques, but they have nothing to say about alternatives to Shell's proposed plans. The Bureau did not discharge its duty pursuant to NEPA.

Because I would reverse the grant of summary judgment to Shell as to the duty to conduct ESA consultation and NEPA analysis, I respectfully dissent.